## SHERBERT *v.* VERNER ET AL., MEMBERS OF SOUTH CAROLINA EMPLOYMENT SECURITY COMMISSION, ET AL.

No. 526.   Argued April 24, 1963.—Decided June 17, 1963.

*William D. Donnelly* argued the cause and filed briefs for appellant.

*Daniel R. McLeod,* Attorney General of South Carolina, argued the cause for appellees. With him on the brief was *Victor S. Evans,* Assistant Attorney General.

Briefs of *amici curiae,* urging reversal, were filed by *Morris B. Abram, Edwin J. Lukas, Arnold Forster, Melvin L. Wulf, Paul Hartman, Theodore Leskes* and *Sol Rabkin* for the American Jewish Committee et al., and by *Leo Pfeffer, Lewis H. Weinstein, Albert Wald, Shad Polier, Ephraim S. London, Samuel Lawrence Brennglass* and *Jacob Sheinkman* for the Synagogue Council of America et al.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Appellant, a member of the Seventh-day Adventist Church, was discharged by her South Carolina employer because she would not work on Saturday, the Sabbath Day of her faith.[1] When she was unable to obtain other employment because from conscientious scruples she would not take Saturday work,[2] she filed a claim for

---

[1] Appellant became a member of the Seventh-day Adventist Church in 1957, at a time when her employer, a textile-mill operator, permitted her to work a five-day week. It was not until 1959 that the work week was changed to six days, including Saturday, for all three shifts in the employer's mill. No question has been raised in this case concerning the sincerity of appellant's religious beliefs. Nor is there any doubt that the prohibition against Saturday labor is a basic tenet of the Seventh-day Adventist creed, based upon that religion's interpretation of the Holy Bible.

[2] After her discharge, appellant sought employment with three other mills in the Spartanburg area, but found no suitable five-day work available at any of the mills. In filing her claim with the Commission, she expressed a willingness to accept employment at other mills, or even in another industry, so long as Saturday work was not required. The record indicates that of the 150 or more Seventh-day Adventists in the Spartanburg area, only appellant and one other have been unable to find suitable non-Saturday employment.

unemployment compensation benefits under the South Carolina Unemployment Compensation Act.[3] That law provides that, to be eligible for benefits, a claimant must be "able to work and . . . available for work"; and, fur-

---

[3] The pertinent sections of the South Carolina Unemployment Compensation Act (S. C. Code, Tit. 68, §§ 68–1 to 68–404) are as follows:

"§ 68–113. Conditions of eligibility for benefits.—An unemployed insured worker shall be eligible to receive benefits with respect to any week only if the Commission finds that: . . .

"(3) He is able to work and is available for work, but no claimant shall be considered available for work if engaged in self-employment of such nature as to return or promise remuneration in excess of the weekly benefit amounts he would have received if otherwise unemployed over such period of time. . . .

"§ 68–114. Disqualification for benefits.—Any insured worker shall be ineligible for benefits: . . .

"(2) *Discharge for misconduct.*—If the Commission finds that he has been discharged for misconduct connected with his most recent work prior to filing a request for determination of insured status or a request for initiation of a claim series within an established benefit year, with such ineligibility beginning with the effective date of such request, and continuing not less than five nor more than the next twenty-two consecutive weeks (in addition to the waiting period), as determined by the Commission in each case according to the seriousness of the misconduct . . . .

"(3) *Failure to accept work.*—(a) If the Commission finds that he has failed, without good cause, (i) either to apply for available suitable work, when so directed by the employment office or the Commission, (ii) to accept available suitable work when offered him by the employment office or the employer or (iii) to return to his customary self-employment (if any) when so directed by the Commission, such ineligibility shall continue for a period of five weeks (the week in which such failure occurred and the next four weeks in addition to the waiting period) as determined by the Commission according to the circumstances in each case . . . .

"(b) In determining whether or not any work is suitable for an individual, the Commission shall consider the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation and the distance of the available work from his residence."

ther, that a claimant is ineligible for benefits "[i]f . . . he has failed, without good cause . . . to accept available suitable work when offered him by the employment office or the employer . . . ." The appellee Employment Secu-. rity Commission, in administrative proceedings under the statute, found that appellant's restriction upon her avail-ability for Saturday work brought her within the pro-vision disqualifying for benefits insured workers who fail, without good cause, to accept "suitable work when of-fered . . . by the employment office or the employer . . . ." The Commission's finding was sustained by the Court of Common Pleas for Spartanburg County.. That court's judgment was in turn affirmed by the South Carolina Supreme Court, which rejected appellant's contention that, as applied to her, the disqualifying provisions of the South Carolina statute abridged her right to the free exercise of her religion secured under the Free Exercise Clause of the First Amendment through the Fourteenth Amendment. The State Supreme Court held specifically that appellant's ineligibility infringed no constitutional liberties because such a construction of the statute "places no restriction upon the appellant's freedom of religion nor does it in any way prevent her in the exercise of her right and freedom to observe her religious beliefs in ac-cordance with the dictates of her conscience." 240 S. C. 286, 303–304, 125 S. E. 2d 737, 746.[4] We noted probable

---

[4] It has been suggested that appellant is not within the class en-titled to benefits under the South Carolina statute because her unem-ployment did not result from discharge or layoff due to lack of work. It is true that unavailability for work for some personal reasons not having to do with matters of conscience or religion has been held to be a basis of disqualification for benefits. See, e. g., Judson Mills v. South Carolina Unemployment Compensation Comm'n, 204 S. C. 37, 28 S. E. 2d 535; Stone Mfg. Co. v. South Carolina Employment Security Comm'n, 219 S. C. 239, 64 S. E. 2d 644. But appellant claims that the Free Exercise Clause prevents the State from basing the denial of benefits upon the "personal reason" she gives for not working on

jurisdiction of appellant's appeal. 371 U. S. 938. We reverse the judgment of the South Carolina Supreme Court and remand for further proceedings not inconsistent with this opinion.

## I.

The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such, *Cantwell* v. *Connecticut,* 310 U. S. 296, 303. Government may neither compel affirmation of a repugnant belief, *Torcaso* v. *Watkins,* 367 U. S. 488; nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities, *Fowler* v. *Rhode Island,* 345 U. S. 67; nor employ the taxing power to inhibit the dissemination of particular religious views, *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Follett* v. *McCormick,* 321 U. S. 573; cf. *Grosjean* v. *American Press Co.,* 297 U. S. 233. On the other hand,

---

Saturday. Where the consequence of disqualification so directly affects First Amendment rights, surely we should not conclude that every "personal reason" is a basis for disqualification in the absence of explicit language to that effect in the statute or decisions of the South Carolina Supreme Court. Nothing we have found in the statute or in the cited decisions, cf. *Lee* v. *Spartan Mills,* 7 CCH Unemployment Ins. Rep. S. C. ¶ 8156 (C. P. 1944), and certainly nothing in the South Carolina Court's opinion in this case so construes the statute. Indeed, the contrary seems to have been that court's basic assumption, for if the eligibility provisions were thus limited, it would have been unnecessary for the court to have decided appellant's constitutional challenge to the application of the statute under the Free Exercise Clause.

Likewise, the decision of the State Supreme Court does not rest upon a finding that appellant was disqualified for benefits because she had been "discharged for misconduct"—by reason of her Saturday absences—within the meaning of § 68–114 (2). That ground was not adopted by the South Carolina Supreme Court, and the appellees do not urge in this Court that the disqualification rests upon that ground.

the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for "even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions." *Braunfeld* v. *Brown,* 366 U. S. 599, 603. The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order. See, *e. g., Reynolds* v. *United States,* 98 U. S. 145; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Prince* v. *Massachusetts,* 321 U. S. 158; *Cleveland* v. *United States,* 329 U. S. 14. Plainly enough, appellant's conscientious objection to Saturday work constitutes no conduct prompted by religious principles of a kind within the reach of state legislation. If, therefore, the decision of the South Carolina Supreme Court is to withstand appellant's constitutional challenge, it must be either because her disqualification as a beneficiary represents no infringement by the State of her constitutional rights of free exercise, or because any incidental burden on the free exercise of appellant's religion may be justified by a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . . ." *NAACP* v. *Button,* 371 U. S. 415, 438.

## II.

We turn first to the question whether the disqualification for benefits imposes any burden on the free exercise of appellant's religion. We think it is clear that it does. In a sense the consequences of such a disqualification to religious principles and practices may be only an indirect result of welfare legislation within the State's general competence to enact; it is true that no criminal sanctions directly compel appellant to work a six-day week. But this is only the beginning, not the end, of our

inquiry.[5]  For "[i]f the purpose ór effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." *Braunfeld* v. *Brown, supra,* at 607.  Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable.  The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.  Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's "right" but merely a "privilege."  It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.[6]  *American*

---

[5] In a closely analogous context, this Court said:
". . . the fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question. Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes.  A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature." *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402.  Cf. *Smith* v. *California,* 361 U. S. 147, 153–155.

[6] See for examples of conditions and qualifications upon governmental privileges and benefits which have been invalidated because of their tendency to inhibit constitutionally protected activity, *Steinberg* v. *United States,* 143 Ct. Cl. 1, 163 F. Supp. 590; *Syrek* v. *Cali-*

*Communications Assn.* v. *Douds,* 339 U. S. 382, 390; *Wieman* v. *Updegraff,* 344 U. S. 183, 191–192; *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146, 155–156. For example, in *Flemming* v. *Nestor,* 363 U. S. 603, 611, the Court recognized with respect to Federal Social Security benefits that "[t]he interest of a covered employee under the Act is of sufficient substance to fall within the protection from arbitrary governmental action afforded by the Due Process Clause." In *Speiser* v. *Randall,* 357 U. S. 513, we emphasized that conditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms. We there struck down a condition which limited the availability of a tax exemption to those members of the exempted class who affirmed their loyalty to the state government granting the exemption. While the State was surely under no obligation to afford such an exemption, we held that the imposition of such a condition upon even a gratuitous benefit inevitably deterred or discouraged the exercise of First Amendment rights of expression and thereby threatened to "produce a result which the State could not command directly." 357 U. S.,

---

fornia *Unemployment Ins. Board,* 54 Cal. 2d 519, 354 P. 2d 625; *Fino* v. *Maryland Employment Security Board,* 218 Md. 504, 147 A. 2d 738; *Chicago Housing Authority* v. *Blackman,* 4 Ill. 2d 319, 122 N. E. 2d 522; *Housing Authority of Los Angeles* v. *Cordova,* 130 Cal. App. 2d 883, 279 P. 2d 215; *Lawson* v. *Housing Authority of Milwaukee,* 270 Wis. 269, 70 N. W. 2d 605; *Danskin* v. *San Diego Unified School District,* 28 Cal. 2d 536, 171 P. 2d 885; *American Civil Liberties Union* v. *Board of Education,* 55 Cal. 2d 167, 359 P. 2d 45; cf. *City of Baltimore* v. *A. S. Abell Co.,* 218 Md. 273, 145 A. 2d 111. See also Willcox, Invasions of the First Amendment Through Conditioned Public Spending, 41 Cornell L. Q. 12 (1955); Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 942–943 (1963); 36 N. Y. U. L. Rev. 1052 (1961); 9 Kan. L. Rev. 346 (1961); Note, Unconstitutional Conditions, 73 Harv. L. Rev. 1595, 1599–1602 (1960).

at 526. "To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Id.*, at 518. Likewise, to condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.

Significantly South Carolina expressly saves the Sunday worshipper from having to make the kind of choice which we here hold infringes the Sabbatarian's religious liberty. When in times of "national emergency" the textile plants are authorized by the State Commissioner of Labor to operate on Sunday, "no employee shall be required to work on Sunday . . . who is conscientiously opposed to Sunday work; and if any employee should refuse to work on Sunday on account of conscientious . . . objections he or she shall not jeopardize his or her seniority by such refusal or be discriminated against in any other manner." S. C. Code, § 64–4. No question of the disqualification of a Sunday worshipper for benefits is likely to arise, since we cannot suppose that an employer will discharge him in violation of this statute. The unconstitutionality of the disqualification of the Sabbatarian is thus compounded by the religious discrimination which South Carolina's general statutory scheme necessarily effects.

## III.

We must next consider whether some compelling state interest enforced in the eligibility provisions of the South Carolina statute justifies the substantial infringement of appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation," *Thomas* v. *Collins*, 323 U. S. 516, 530.

No such abuse or danger has been advanced in the present case. The appellees suggest no more than a possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might not only dilute the unemployment compensation fund but also hinder the scheduling by employers of necessary Saturday work. But that possibility is not apposite here because no such objection appears to have been made before the South Carolina Supreme Court, and we are unwilling to assess the importance of an asserted state interest without the views of the state court. Nor, if the contention had been made below, would the record appear to sustain it; there is no proof whatever to warrant such fears of malingering or deceit as those which the respondents now advance. Even if consideration of such evidence is not foreclosed by the prohibition against judicial inquiry into the truth or falsity of religious beliefs, *United States* v. *Ballard,* 322 U. S. 78—a question as to which we intimate no view since it is not before us—it is highly doubtful whether such evidence would be sufficient to warrant a substantial infringement of religious liberties. For even if the possibility of spurious claims did threaten to dilute the fund and disrupt the scheduling of work, it would plainly be incumbent upon the appellees to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights.[7] Cf. *Shelton* v. *Tucker,* 364 U. S.

---

[7] We note that before the instant decision, state supreme courts had, without exception, granted benefits to persons who were physically available for work but unable to find suitable employment solely because of a religious prohibition against Saturday work. *E. g., In re Miller,* 243 N. C. 509, 91 S. E. 2d 241; *Swenson* v. *Michigan Employment Security Comm'n,* 340 Mich. 430, 65 N. W. 2d 709; *Tary* v. *Board of Review,* 161 Ohio St. 251, 119 N. E. 2d 56. Cf. *Kut* v. *Albers Super Markets, Inc.,* 146 Ohio St. 522, 66 N. E. 2d 643, appeal dismissed *sub nom. Kut* v. *Bureau of Unemployment Compensation,* 329 U. S. 669. One author has observed, "the law was settled that

479, 487–490; *Talley* v. *California,* 362 U. S. 60, 64; *Schneider* v. *State,* 308 U. S. 147, 161; *Martin* v. *Struthers,* 319 U. S. 141, 144–149.

In these respects, then, the state interest asserted in the present case is wholly dissimilar to the interests which were found to justify the less direct burden upon religious practices in *Braunfeld* v. *Brown, supra.* The Court recognized that the Sunday closing law which that decision sustained undoubtedly served "to make the practice of [the Orthodox Jewish merchants'] . . . religious beliefs more expensive," 366 U. S., at 605. But the statute was nevertheless saved by a countervailing factor which finds no equivalent in the instant case—a strong state interest in providing one uniform day of rest for all workers. That secular objective could be achieved, the Court found, only by declaring Sunday to be that day of rest. Requiring exemptions for Sabbatarians, while theoretically possible, appeared to present an administrative

conscientious objections to work on the Sabbath made such work unsuitable and that such objectors were nevertheless available for work. . . . A contrary opinion would make the unemployment compensation law unconstitutional, as a violation of freedom of religion. Religious convictions, strongly held, are so impelling as to constitute good cause for refusal. Since availability refers to suitable work, religious observers were not unavailable because they excluded Sabbath work." Altman, Availability for Work: A Study in Unemployment Compensation (1950), 187. See also Sanders, Disqualification for Unemployment Insurance, 8 Vand. L. Rev. 307, 327–328 (1955); 34 N. C. L. Rev. 591 (1956); cf. Freeman, Able To Work and Available for Work, 55 Yale L. J. 123, 131 (1945). Of the 47 States which have eligibility provisions similar to those of the South Carolina statute, only 28 appear to have given administrative rulings concerning the eligibility of persons whose religious convictions prevented them from accepting available work. Twenty-two of those States have held such persons entitled to benefits, although apparently only one such decision rests exclusively upon the federal constitutional ground which constitutes the basis of our decision. See 111 U. of Pa. L. Rev. 253, and n. 3 (1962); 34 N. C. L. Rev. 591, 602, n. 60 (1956).

problem of such magnitude, or to afford the exempted class so great a competitive advantage, that such a requirement would have rendered the entire statutory scheme unworkable.[8]  In the present case no such justifications underlie the determination of the state court that appellant's religion makes her ineligible to receive benefits.[9]

## IV.

In holding as we do, plainly we are not fostering the "establishment" of the Seventh-day Adventist religion in South Carolina, for the extension of unemployment benefits to Sabbatarians in common with Sunday worshippers reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall.  See *School District of Abington Township* v. *Schempp, ante,* p. 203.  Nor does the recognition of the appellant's right to unemployment benefits under the state statute serve to abridge any other person's religious liberties.  Nor do we, by our decision today, declare the existence of a constitutional right to unemployment benefits on the part

---

[8] See Note, State Sunday Laws and the Religious Guarantees of the Federal Constitution, 73 Harv. L. Rev. 729, 741–745 (1960).

[9] These considerations also distinguish the quite different case of *Flemming* v. *Nestor, supra,* upon which appellees rely.  In that case the Court found that the compelling federal interests which underlay the decision of Congress to impose such a disqualification justified whatever effect the denial of social security benefits may have had upon the disqualified class.  See 363 U. S., at 612.  And compare *Torcaso* v. *Watkins, supra,* in which an undoubted state interest in ensuring the veracity and trustworthiness of Notaries Public was held insufficient to justify the substantial infringement upon the religious freedom of applicants for that position which resulted from a required oath of belief in God.  See 74 Harv. L. Rev. 611, 612–613 (1961); 109 U. of Pa. L. Rev. 611, 614–616 (1961).

of all persons whose religious convictions are the cause of their unemployment. This is not a case in which an employee's religious convictions serve to make him a nonproductive member of society. See note 2, *supra*. Finally, nothing we say today constrains the States to adopt any particular form or scheme of unemployment compensation. Our holding today is only that South Carolina may not constitutionally apply the eligibility provisions so as to constrain a worker to abandon his religious convictions respecting the day of rest. This holding but reaffirms a principle that we announced a decade and a half ago, namely that no State may "exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation." *Everson* v. *Board of Education,* 330 U. S. 1, 16.

In view of the result we have reached under the First and Fourteenth Amendments' guarantee of free exercise of religion, we have no occasion to consider appellant's claim that the denial of benefits also deprived her of the equal protection of the laws in violation of the Fourteenth Amendment.

The judgment of the South Carolina Supreme Court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

The case we have for decision seems to me to be of small dimensions, though profoundly important. The question is whether the South Carolina law which denies unemployment compensation to a Seventh-day Adventist, who, because of her religion, has declined to work on her Sabbath, is a law "prohibiting the free exercise" of religion as those words are used in the First Amendment.

It seems obvious to me that this law does run afoul of that clause.

Religious scruples of Moslems require them to attend a mosque on Friday and to pray five times daily.[1] Religious scruples of a Sikh require him to carry a regular or a symbolic sword. *Rex* v. *Singh,* 39 A. I. R. 53 (Allahabad, 1952). Religious scruples of a Jehovah's Witness teach him to be a colporteur, going from door to door, from town to town, distributing his religious pamphlets. See *Murdock* v. *Pennsylvania,* 319 U. S. 105. Religious scruples of a Quaker compel him to refrain from swearing and to affirm instead. See *King* v. *Fearson,* Fed. Cas. No. 7,790, 14 Fed. Cas. 520; 1 U. S. C. § 1; Federal Rules of Civil Procedure, Rule 43 (d); *United States* v. *Schwimmer,* 279 U. S. 644, 655 (dissenting opinion). Religious scruples of a Buddhist may require him to refrain from partaking of any flesh, even of fish.[2]

The examples could be multiplied, including those of the Seventh-day Adventist whose Sabbath is Saturday and who is advised not to eat some meats.[3]

These suffice, however, to show that many people hold beliefs alien to the majority of our society—beliefs that are protected by the First Amendment but which could easily be trod upon under the guise of "police" or "health" regulations reflecting the majority's views

Some have thought that a majority of a community can, through state action, compel a minority to observe their particular religious scruples so long as the majority's rule can be said to perform some valid secular function.

[1] See Shorter Encyclopaedia of Islam (Cornell Press, 1953), 336, 493.

[2] See Narasu, The Essence of Buddhism (3d ed. 1948), 52–55; 6 Encyclopaedia of Religion and Ethics (1913), 63–65.

[3] See Seventh-day Adventists Answer Questions on Doctrine (1957), 149–153, 622–624; Mitchell, Seventh-Day Adventists (1st ed. 1958), 127, 176–178.

That was the essence of the Court's decision in the Sunday Blue Law Cases (*Gallagher* v. *Crown Kosher Market*, 366 U. S. 617; *Braunfeld* v. *Brown*, 366 U. S. 599; *McGowan* v. *Maryland*, 366 U. S. 420), a ruling from which I then dissented (*McGowan* v. *Maryland*, supra, pp. 575–576) and still dissent. See *Arlan's Dept. Store* v. *Kentucky*, 371 U. S. 218.

That ruling of the Court travels part of the distance that South Carolina asks us to go now. She asks us to hold that when it comes to a day of rest a Sabbatarian must conform with the scruples of the majority in order to obtain unemployment benefits.

The result turns not on the degree of injury, which may indeed be nonexistent by ordinary standards. The harm is the interference with the individual's scruples or conscience—an important area of privacy which the First Amendment fences off from government. The interference here is as plain as it is in Soviet Russia, where a churchgoer is given a second-class citizenship, resulting in harm though perhaps not in measurable damages.

This case is resolvable not in terms of what an individual can demand of government, but solely in terms of what government may not do to an individual in violation of his religious scruples. The fact that government cannot exact from me a surrender of one iota of my religious scruples does not, of course, mean that I can demand of government a sum of money, the better to exercise them. For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.

Those considerations, however, are not relevant here. If appellant is otherwise qualified for unemployment benefits, payments will be made to her not as a Seventh-day Adventist, but as an unemployed worker. Conceivably these payments will indirectly benefit her church,

but no more so than does the salary of any public employee. Thus, this case does not involve the problems of direct or indirect state assistance to a religious organization—matters relevant to the Establishment Clause, not in issue here.

MR. JUSTICE STEWART, concurring in the result.

Although fully agreeing with the result which the Court reaches in this case, I cannot join the Court's opinion. This case presents a double-barreled dilemma, which in all candor I think the Court's opinion has not succeeded in papering over. The dilemma ought to be resolved.

## I.

Twenty-three years ago in *Cantwell* v. *Connecticut*, 310 U. S. 296, 303, the Court said that both the Establishment Clause and the Free Exercise Clause of the First Amendment were made wholly applicable to the States by the Fourteenth Amendment. In the intervening years several cases involving claims of state abridgment of individual religious freedom have been decided here—most recently *Braunfeld* v. *Brown*, 366 U. S. 599, and *Torcaso* v. *Watkins*, 367 U. S. 488. During the same period "cases dealing with the specific problems arising under the 'Establishment' Clause which have reached this Court are few in number." [1] The most recent are last Term's *Engel* v. *Vitale*, 370 U. S. 421, and this Term's *Schempp* and *Murray* cases, *ante*, p. 203.

I am convinced that no liberty is more essential to the continued vitality of the free society which our Constitution guarantees than is the religious liberty protected by the Free Exercise Clause explicit in the First Amendment and imbedded in the Fourteenth. And I regret that on

---

[1] *McGowan* v. *Maryland*, 366 U. S. 420, 442.

occasion, and specifically in *Braunfeld* v. *Brown, supra,* the Court has shown what has seemed to me a distressing insensitivity to the appropriate demands of this constitutional guarantee. By contrast I think that the Court's approach to the Establishment Clause has on occasion, and specifically in *Engel, Schempp* and *Murray,* been not only insensitive, but positively wooden, and that the Court has accorded to the Establishment Clause a meaning which neither the words, the history, nor the intention of the authors of that specific constitutional provision even remotely suggests.

But my views as to the correctness of the Court's decisions in these cases are beside the point here. The point is that the decisions are on the books. And the result is that there are many situations where legitimate claims under the Free Exercise Clause will run into head-on collision with the Court's insensitive and sterile construction of the Establishment Clause.[2] The controversy now before us is clearly such a case.

Because the appellant refuses to accept available jobs which would require her to work on Saturdays, South Carolina has declined to pay unemployment compensation benefits to her. Her refusal to work on Saturdays is based on the tenets of her religious faith. The Court says that South Carolina cannot under these circumstances declare her to be not "available for work" within the meaning of its statute because to do so would violate her constitutional right to the free exercise of her religion.

Yet what this Court has said about the Establishment Clause must inevitably lead to a diametrically opposite result. If the appellant's refusal to work on Saturdays

---

[2] The obvious potentiality of such collision has been studiously ignored by the Court, but has not escaped the perception of commentators. See, *e. g.,* Katz, Freedom of Religion and State Neutrality, 20 U. of Chi. L. Rev. 426, 428 (1953); Kauper, Prayer, Public Schools and the Supreme Court, 61 Mich. L. Rev. 1031, 1053 (1963).

were based on indolence, or on a compulsive desire to watch the Saturday television programs, no one would say that South Carolina could not hold that she was not "available for work" within the meaning of its statute. That being so, the Establishment Clause as construed by this Court not only *permits* but affirmatively *requires* South Carolina equally to deny the appellant's claim for unemployment compensation when her refusal to work on Saturdays is based upon her religious creed.  For, as said in *Everson* v. *Board of Education,* 330 U. S. 1, 11, the Establishment Clause bespeaks "a government . . . stripped of all power . . . to support, or otherwise to assist any or all religions . . . ," and no State "can pass laws which aid one religion . . . ."  *Id.,* at 15.  In Mr. Justice Rutledge's words, adopted by the Court today in *Schempp, ante,* p. 217, the Establishment Clause forbids "every form of public aid or support for religion." 330 U. S., at 32.  In the words of the Court in *Engel* v. *Vitale,* 370 U. S., at 431, reaffirmed today in the *Schempp* case, *ante,* p. 221, the Establishment Clause forbids the "financial support of government" to be "placed behind a particular religious belief."

To require South Carolina to so administer its laws as to pay public money to the appellant under the circumstances of this case is thus clearly to require the State to violate the Establishment Clause as construed by this Court.  This poses no problem for me, because I think the Court's mechanistic concept of the Establishment Clause is historically unsound and constitutionally wrong. I think the process of constitutional decision in the area of the relationships between government and religion demands considerably more than the invocation of broadbrushed rhetoric of the kind I have quoted.  And I think that the guarantee of religious liberty embodied in the Free Exercise Clause affirmatively requires government to create an atmosphere of hospitality and accommoda-

tion to individual belief or disbelief. In short, I think our Constitution commands the positive protection by government of religious freedom—not only for a minority, however small—not only for the majority, however large—but for each of us.

South Carolina would deny unemployment benefits to a mother unavailable for work on Saturdays because she was unable to get a babysitter.[3] Thus, we do not have before us a situation where a State provides unemployment compensation generally, and singles out for disqualification only those persons who are unavailable for work on religious grounds. This is not, in short, a scheme which operates so as to discriminate against religion as such. But the Court nevertheless holds that the State must prefer a religious over a secular ground for being unavailable for work—that state financial support of the appellant's religion is constitutionally required to carry out "the governmental obligation of neutrality in the face of religious differences. . . ."

Yet in cases decided under the Establishment Clause the Court has decreed otherwise. It has decreed that government must blind itself to the differing religious beliefs and traditions of the people. With all respect, I think it is the Court's duty to face up to the dilemma posed by the conflict between the Free Exercise Clause of the Constitution and the Establishment Clause as interpreted by the Court. It is a duty, I submit, which we owe to the people, the States, and the Nation, and a duty which we owe to ourselves. For so long as the resounding but fallacious fundamentalist rhetoric of some of our Establishment Clause opinions remains on our books, to be disregarded at will as in the present case,

---

[3] See *Judson Mills* v. *South Carolina Unemployment Compensation Comm'n,* 204 S. C. 37, 28 S. E. 2d 535; *Hartsville Cotton Mill* v. *South Carolina Employment Security Comm'n,* 224 S. C. 407, 79 S. E. 2d 381.

or to be undiscriminatingly invoked as in the *Schempp* case, *ante,* p. 203, so long will the possibility of consistent and perceptive decision in this most difficult and delicate area of constitutional law be impeded and impaired. And so long, I fear, will the guarantee of true religious freedom in our pluralistic society be uncertain and insecure.

## II.

My second difference with the Court's opinion is that I cannot agree that today's decision can stand consistently with *Braunfeld* v. *Brown, supra.* The Court says that there was a "less direct burden upon religious practices" in that case than in this. With all respect, I think the Court is mistaken, simply as a matter of fact. The *Braunfeld* case involved a state *criminal* statute. The undisputed effect of that statute, as pointed out by MR. JUSTICE BRENNAN in his dissenting opinion in that case, was that " 'Plaintiff, Abraham Braunfeld, will be unable to continue in his business if he may not stay open on Sunday and he will thereby lose his capital investment.' In other words, the issue in this case—and we do not understand either appellees or the Court to contend otherwise—is whether a State may put an individual to a choice between his business and his religion." 366 U. S., at 611.

The impact upon the appellant's religious freedom in the present case is considerably less onerous. We deal here not with a criminal statute, but with the particularized administration of South Carolina's Unemployment Compensation Act. Even upon the unlikely assumption that the appellant could not find suitable non-Saturday employment,[4] the appellant at the worst would be denied

---

[4] As noted by the Court, "The record indicates that of the 150 or more Seventh-day Adventists in the Spartanburg area, only appellant and one other have been unable to find suitable non-Saturday employment." *Ante,* p. 399, n. 2.

a maximum of 22 weeks of compensation payments. I agree with the Court that the possibility of that denial is enough to infringe upon the appellant's constitutional right to the free exercise of her religion. But it is clear to me that in order to reach this conclusion the Court must explicitly reject the reasoning of *Braunfeld* v. *Brown.* I think the *Braunfeld* case was wrongly decided and should be overruled, and accordingly I concur in the result reached by the Court in the case before us.

MR. JUSTICE HARLAN, whom MR. JUSTICE WHITE joins, dissenting.

Today's decision is disturbing both in its rejection of existing precedent and in its implications for the future. The significance of the decision can best be understood after an examination of the state law applied in this case.

South Carolina's Unemployment Compensation Law was enacted in 1936 in response to the grave social and economic problems that arose during the depression of that period. As stated in the statute itself:

> "Economic insecurity due to unemployment is a serious menace to health, morals and welfare of the people of this State; *involuntary unemployment* is therefore a subject of general interest and concern . . . ; the achievement of social security requires protection against this greatest hazard of our economic life; this can be provided by encouraging the employers *to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment,* thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance." § 68-38. (Emphasis added.)

Thus the purpose of the legislature was to tide people over, and to avoid social and economic chaos, during periods when *work was unavailable*. But at the same time there was clearly no intent to provide relief for those who for purely personal reasons were or became *unavailable for work*. In accordance with this design, the legislature provided, in § 68–113, that "[a]n unemployed insured worker shall be eligible to receive benefits with respect to any week *only* if the Commission finds that . . . [h]e is able to work and is available for work . . . ." (Emphasis added.)

The South Carolina Supreme Court has uniformly applied this law in conformity with its clearly expressed purpose. It has consistently held that one is not "available for work" if his unemployment has resulted not from the inability of industry to provide a job but rather from personal circumstances, no matter how compelling. The reference to "involuntary unemployment" in the legislative statement of policy, whatever a sociologist, philosopher, or theologian might say, has been interpreted not to embrace such personal circumstances. See, *e. g., Judson Mills* v. *South Carolina Unemployment Compensation Comm'n,* 204 S. C. 37, 28 S. E. 2d 535 (claimant was "unavailable for work" when she became unable to work the third shift, and limited her availability to the other two, because of the need to care for her four children); *Stone Mfg. Co.* v. *South Carolina Employment Security Comm'n,* 219 S. C. 239, 64 S. E. 2d 644; *Hartsville Cotton Mill* v. *South Carolina Employment Security Comm'n,* 224 S. C. 407, 79 S. E. 2d 381.

In the present case all that the state court has done is to apply these accepted principles. Since virtually all of the mills in the Spartanburg area were operating on a six-day week, the appellant was "unavailable for work," and thus ineligible for benefits, when personal considera-

tions prevented her from accepting employment on a full-time basis in the industry and locality in which she had worked. The fact that these personal considerations sprang from her religious convictions was wholly without relevance to the state court's application of the law. Thus in no proper sense can it be said that the State discriminated against the appellant on the basis of her religious beliefs or that she was denied benefits *because* she was a Seventh-day Adventist. She was denied benefits just as any other claimant would be denied benefits who was not "available for work" for personal reasons.[1]

With this background, this Court's decision comes into clearer focus. What the Court is holding is that if the State chooses to condition unemployment compensation on the applicant's availability for work, it is constitutionally compelled to *carve out an exception*—and to provide benefits—for those whose unavailability is due to their religious convictions.[2] Such a holding has particular significance in two respects.

---

[1] I am completely at a loss to understand note 4 of the Court's opinion. Certainly the Court is not basing today's decision on the unsupported supposition that *some* day, the South Carolina Supreme Court may conclude that there is *some* personal reason for unemployment that may not disqualify a claimant for relief. In any event, I submit it is perfectly clear that South Carolina would not compensate persons who became unemployed for *any* personal reason, as distinguished from layoffs or lack of work, since the State Supreme Court's decisions make it plain that such persons would not be regarded as "available for work" within the manifest meaning of the eligibility requirements. Nor can I understand what this Court means when it says that "if the eligibility provisions were thus limited, it would have been unnecessary for the [South Carolina] court to have decided appellant's constitutional challenge . . . ."

[2] The Court does suggest, in a rather startling disclaimer, *ante,* pp. 409–410, that its holding is limited in applicability to those whose religious convictions do not make them "nonproductive" members of society, noting that most of the Seventh-day Adventists in the Spartanburg area are employed. But surely this disclaimer cannot be

*First,* despite the Court's protestations to the contrary, the decision necessarily overrules *Braunfeld* v. *Brown,* 366 U. S. 599, which held that it did not offend the "Free Exercise" Clause of the Constitution for a State to forbid a Sabbatarian to do business on Sunday. The secular purpose of the statute before us today is even clearer than that involved in *Braunfeld.* And just as in *Braunfeld*—where exceptions to the Sunday closing laws for Sabbatarians would have been inconsistent with the purpose to achieve a uniform day of rest and would have required case-by-case inquiry into religious beliefs—so here, an exception to the rules of eligibility based on religious convictions would necessitate judicial examination of those convictions and would be at odds with the limited purpose of the statute to smooth out the economy during periods of industrial instability. Finally, the indirect financial burden of the present law is far less than that involved in *Braunfeld.* Forcing a store owner to close his business on Sunday may well have the effect of depriving him of a satisfactory livelihood if his religious convictions require him to close on Saturday as well. Here we are dealing only with temporary benefits, amounting to a fraction of regular weekly wages and running for not more than 22 weeks. See §§ 68–104, 68–105. Clearly, any differences between this case and *Braunfeld* cut against the present appellant.[3]

---

taken seriously, for the Court cannot mean that the case would have come out differently if none of the Seventh-day Adventists in Spartanburg had been gainfully employed, or if the appellant's religion had prevented her from working on Tuesdays instead of Saturdays. Nor can the Court be suggesting that it will make a value judgment in each case as to whether a particular individual's religious convictions prevent him from being "productive." I can think of no more inappropriate function for this Court to perform.

[3] The Court's reliance on South Carolina Code § 64–4, *ante,* p. 406, to support its conclusion with respect to free exercise, is misplaced. Section 64–4, which is not a part of the Unemployment Compensa-

*Second,* the implications of the present decision are far more troublesome than its apparently narrow dimensions would indicate at first glance. The meaning of today's holding, as already noted, is that the State must furnish unemployment benefits to one who is unavailable for work if the unavailability stems from the exercise of religious convictions. The State, in other words, must *single out* for financial assistance those whose behavior is religiously motivated, even though it denies such assistance to others whose identical behavior (in this case, inability to work on Saturdays) is not religiously motivated.

It has been suggested that such singling out of religious conduct for special treatment may violate the constitutional limitations on state action. See Kurland, Of Church and State and The Supreme Court, 29 U. of Chi. L. Rev. 1; cf. *Cammarano* v. *United States,* 358 U. S. 498, 515 (concurring opinion). My own view, however, is that at least under the circumstances of this case it would be a permissible accommodation of religion for the State, if it *chose* to do so, to create an exception to its eligibility requirements for persons like the appellant. * The constitutional obligation of "neutrality," see *School District of Abington Township* v. *Schempp, ante,* p. 222, is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation. There are too many instances in which no such course can be charted, too many areas in which the pervasive activities of the State justify some special provision for religion to prevent it from being submerged by an all-embracing secularism. The State violates its obligation of neutrality

tion Law, is an extremely narrow provision that becomes operative only during periods of national emergency and thus has no bearing in the circumstances of the present case. And plainly under our decisions in the "Sunday law" cases, appellant can derive no support for her position from the State's general statutory provisions setting aside Sunday as a uniform day of rest.

when, for example, it mandates a daily religious exercise in its public schools, with all the attendant pressures on the school children that such an exercise entails. See *Engel* v. *Vitale,* 370 U. S. 421; *School District of Abington Township* v. *Schempp, supra.* But there is, I believe, enough flexibility in the Constitution to permit a legislative judgment accommodating an unemployment compensation law to the exercise of religious beliefs such as appellant's.

For very much the same reasons, however, I cannot subscribe to the conclusion that the State is constitutionally *compelled* to carve out an exception to its general rule of eligibility in the present case. Those situations in which the Constitution may require special treatment on account of religion are, in my view, few and far between, and this view is amply supported by the course of constitutional litigation in this area. See, *e. g., Braunfeld* v. *Brown, supra; Cleveland* v. *United States,* 329 U. S. 14; *Prince* v. *Massachusetts,* 321 U. S. 158; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Reynolds* v. *United States,* 98 U. S. 145. Such compulsion in the present case is particularly inappropriate in light of the indirect, remote, and insubstantial effect of the decision below on the exercise of appellant's religion and in light of the direct financial assistance to religion that today's decision requires.

For these reasons I respectfully dissent from the opinion and judgment of the Court.[4]

---

[4] Since the Court states, *ante,* p. 410, that it does not reach the appellant's "equal protection" argument, based upon South Carolina's emergency Sunday-work provisions, §§ 64-4, 64-6, I do not consider it appropriate for me to do so.