Jasen, J. (dissenting).
The officials charged with the responsibility for administering the State labor laws found that the claimant left his employment rather than report to work without wearing a potentially inflammatory political button. The record supports their conclusion that claimant abandoned his employment without cause or justification, thereby rendering him ineligible to receive unemployment insurance benefits without a period of subsequent employment. I would also hold that denial of unemployment insurance benefits, under the circumstances presented, is not precluded by the First and Fourteenth Amendments of the Federal Constitution.
The claimant was employed as a plumber’s helper by a heating and plumbing concern in Rhinebeck, New York. His duties required him to work at the residences and business premises of his employer’s customers. In September, 1973, at the height of the Watergate investigation, claimant began reporting to work with a button on his work uniform that impliedly advocated the impeachment of the President of the United States. On the second day, the president of the firm requested that claimant not wear the button to work on the ground that "it was detrimental to his business.” Claimant refused and was fired. If the claimant had removed the button, he would not have been discharged. In a report of employment filed with the State Department of Labor, the employer reported that the claimant "left because we would not allow him to wear a political button on our. Rhinebeck Plbg. uniform. We felt the button could affect our relationship with the customers. We informed him that there was [sic] no personal feelings involved, but the manner in which he conducted himself during working hours could also reflect against Rhinebeck Plbg.’s name. This in turn could affect the outlook for the entire company.” Claimant’s application for unemployment insurance benefits was denied by the industrial commissioner upon the ground that he "quit [his] job without good cause.” This determination was sustained by a referee and the Unemployment Insurance Appeal Board affirmed. The Appellate Division, Third Department, reversed, finding that a denial of unemployment insurance benefits would be State action penal *186 izing the claimant for exercising his right to freedom of speech. (46 AD2d 253.)
I would reverse. The Unemployment Insurance Law provides that an employee who voluntarily leaves his employment or who is discharged for misconduct in connection with his employment is ineligible to receive unemployment insurance benefits, at least until a subsequent requalifying period of employment is completed. (Labor Law, § 593.) In Matter of James (Levine) (34 NY2d 491), the court set forth the tests to be applied in assessing the applicability of the statute to a given set of facts. Voluntary separation is usually "confined to the giving up of employment permanently or temporarily, without cause or justification” (at p 498). On the other hand, where an employee is discharged for valid cause, the cause must "rise to the level of misconduct before an employee becomes ineligible to receive benefits” (at p 496).
A voluntary separation from employment will only disqualify a claimant if the separation was "without good cause”. (Labor Law, § 593, subd 1.) Whether a particular separation from employment is voluntary and without good cause is usually a question of fact to be resolved at the administrative level. (Matter of Fisher [Levine], 36 NY2d 146, 150.) If there is substantial evidence to support the determination made by the officials directly responsible for the administration of State labor laws, that determination may not be set aside by the courts. (Labor Law, § 623; Matter of Green [Republic Steel Corp.—Levine] 37 NY2d 554, 559.)
In this case, there is substantial evidence to support the conclusion that the claimant’s separation was voluntary and without good cause. An employer, unless precluded by statute or collective bargaining agreement, is entitled to establish reasonable rules and regulations governing the conduct of his employees. (Matter of Gladsone [Catherwood] 36 AD2d 204, 205, affd 30 NY2d 576.) Where the rules and conditions of employment promulgated by the employer are reasonable, an employee who refuses to abide by them, and leaves his employment, acts without good cause. (See, e.g., Matter of Blau [Catherwood] 29 AD2d 701; Matter of Glassmith [Cather-wood] 27 AD2d 584; 62 NY Jur, Unemployment Insurance, § 111, P 98.)
Despite the majority’s insistence upon a narrow reading of the referee’s findings of fact, it is manifest that the administrative officials, at all levels of the adjudicatory process, found *187 that the claimant voluntarily left his employment, rather than comply with a reasonable rule established by his employer. The industrial commissioner specifically determined that the claimant "quit” his job. The referee, after a hearing, concluded that "[t]he initial determination is sustained.” The referee’s decision, in turn, was affirmed by the Unemployment Insurance Appeal Board.
In my view, the hearing record supports the finding that the claimant voluntarily left his employment. Although initially stating that he was discharged, claimant subsequently acknowledged that he had really been instructed that, if he desired to continue working with the employer, he would have to remove the button from his work uniform. He elected not to remove the button and left.
The majority places great reliance on the statement in the referee’s descriptive findings of fact that claimant "was discharged as a result of his failure” to remove the button. Ignored is the fact that the referee, in his decision, sustained the initial determination by the industrial commissioner that the claimant voluntarily quit his job. Indeed, in the course of the hearing, the referee stated: "I am prepared to find that the claimant did quit his job because he was given an option, and he could have continued to work for the employer by complying with the employer’s direct request, and he chose not to, and therefore he left the job.” When the claimant’s attorney protested this proposed finding, the referee cut him off with the comment that "the facts are clear here”. The referee went on to explain that the claimant "was given an option to comply with the request or the directive or not, and he could have continued to work there, but he chose not to do so, and it was up to him, and he took action, and there is no way that can be interpreted any other way”. The sole conclusion to be drawn from this record is that the claimant was given the option of continuing his employment relationship under rules established by the employer. The granting of such an option is hardly consonant with the air finality that attends ultimate discharge. A fair reading of the record belies the interpretation effected by the majority. The court obfuscates what was eminently clear to the labor officials who determined this case, that the claimant voluntarily left his job.
Moreover, the majority confuses voluntary separation without good cause with the doctrine of provoked discharge. Vol *188 untary separation occurs when the employee, without valid cause or justification, declines to continue his employment. In this case, the claimant deliberately left his employment, rather than comply with a reasonable condition of employment. A provoked discharge, on the other hand, is a discharge by the employer necessitated by governmental regulation or union bargaining agreement. The classic example is a discharge mandated by the employee’s refusal to abide by a union shop provision in a collective bargaining agreement. (Matter of Malaspina [Corsi], 309 NY 413.) In both voluntary separation and provoked discharge, an act of the employee is the producing cause of the termination. The same might be said of employee misconduct, which even the majority concedes will result in ineligibility. The critical distinction between voluntary separation and provoked discharge is that the former is voluntary leaving of employment by the employee without good cause, whereas the latter is an involuntary discharge by the employer of the employee for good cause. The doctrine of provoked discharge must be carefully limited since it is but "a legitimate and essential gloss on the statute to fill a gap.” (Matter of James [Levine], 34 NY2d 491, 494-495, supra.) On the other hand, a voluntary separation without good cause must create ineligibility since the Legislature has specifically required that it should. It is for this reason that the crucial fact is not, as the majority views it, that the employer might not have chosen to fire the claimant. What is significant is that the claimant chose not to work for the employer rather than comply with work rules established by the employer and found to be reasonable by the State labor officials.
An employer whose employees come into contact with members of the public may reasonably require that the employees refrain from conduct that might trigger adverse public reaction. (See Eastern Greyhound Lines Div. of Greyhound Lines v New York State Div. of Human Rights, 27 NY2d 279; Matter of Gladstone [Catherwood] 36 AD2d 204, affd 30 NY2d 576, supra.) The need for such regulation is particularly acute where the employees perform their duties in homes or on the private property of the customers. Common experience reveals that the employer will be held responsible for employee actions that the client deems noxious or offensive. The average employer has no interest in acting as a self-appointed community censor. The real concern, and it is a valid one, is that the *189 employer will be financially damaged as a result of consumer unhappiness with the actions of his employees.
It is a commonplace fact of the human experience that disputes or disagreements over controversial subjects may arouse anger or animosity in the participants to the discussion. Passions may be particularly inflamed by adverse comments directed at respected or venerated community leaders. In this case, the employer had every reason to be concerned that some of his customers might be offended by criticism of the President of the United States. The occupant of that office is generally widely admired and respected. The employer could reasonably fear that a button, sported by his employee, suggesting that the President should be impeached might offend the sensibilities of some of his customers. At the very least, it might touch off a rancorous political debate which could arouse a customer’s ill-will. An employer should be able to protect himself against that eventuality by requiring that his employees, during business hours, refrain from overt political activity. Moreover, the employer is not required to take a poll or otherwise measure the likelihood that his customers will react adversely to his employee’s political views. The majority’s insistence that the employer prove that the employee’s conduct was detrimental to his business interest is both irrelevant and naive. It is sufficient if the employer believes that his business will be adversely affected by the employee’s conduct.
Denying an employee unemployment insurance benefits for failure to abide by a reasonable regulation of employee conduct does not involve State infringement of the employee’s First Amendment rights. The freedom of speech is not an absolute right. It is subject to reasonable regulations under certain circumstances. (See, e.g., Tinker v Des Moines School Dist., 393 US 503, 513.) Expression may be "basically incompatible with the normal activity of a particular place at a time.” (Grayned v City of Rockford, 408 US 104, 116.) Entrance into an employment relationship necessarily entails some reduction in personal liberty. An employer may require, within reason, that an employee report to work at a given place, at a given time, dressed in a certain manner, that the work be done in accordance with established practices, that the employee heed the instructions of his supervisors and that fellow employees be permitted to work undisturbed. These restrictions are normally accepted by our society as necessary *190 for the orderly conduct of a business and as part of the process by which one earns a livelihood. Persons who are unwilling to abide by reasonable regulations are, of course, free to decline employment. However, refusal to comply with reasonable work regulations should preclude receipt of unemployment insurance benefits.
Sherbert v Verner (374 US 398) is not to the contrary. In that case, an employee was denied unemployment insurance benefits because of her refusal to accept Saturday work for religious reasons. The court ruled that government could not permissibly require an employee to choose between abandoning the precepts of her religion in order to work and, on the other hand, following her religion and forfeiting unemployment insurance benefits. (374 US, at p 404.) The effect of the State rule under consideration in Sherbert was to penalize the employee for holding a particular religious belief. Withholding unemployment insurance benefits where the employee insists on being able to make political statements to members of the public on company time, to the possible detriment of the business, does not penalize the employee for holding a particular belief. Nor does it require the employee to take an affirmative action in violation of his conscience. (Matter of Moran [Catherwood], 34 AD2d 694, affd 27 NY2d 946.) Rather, it is an affirmation of the general rule that an employer is not obligated to permit his employees to engage in overt political activity during business hours. The employee is not constrained to abandon his political opinions (see Sherbert v Verner, 374 US, at p 410, supra), but may not insist on expressing them on his employer’s time to his employer’s customers.
For the reasons stated, I dissent and vote to reverse the order of the Appellate Division.
Chief Judge Breitel and Judges Gabrielli, Jones, Fuchs-berg and Cooke concur with Judge Wachtler; Judge Jasen dissents and votes to reverse in separate opinion.
Order affirmed, with costs.