**Herbert Daniel DETTMER, Plaintiff,**

v.

**Robert LANDON, Director of Corrections, Defendant.**

**Civ. A. No. 84–1090–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 28, 1985.

---

Herbert Daniel Dettmer, pro se.

Peter H. Rudy, Asst. Atty. Gen., Richmond, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter comes before the Court on a trial to the bench on August 26, 1985. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### Facts

Plaintiff Herbert Dettmer is a 29 year old inmate incarcerated at the Powhatan Correctional Center in State Farm, Virginia. Dettmer claims that his first amendment right to the free exercise of his religion, the Church of Wicca (more commonly known as witchcraft), is being violated by prison officials who have refused to give him any access to his religion's worship materials. Prison security officials contend that the worship materials that Dettmer seeks—candles, a statue, a white robe, incense and either sulfur, sea salt or uniodized salt—would be hazardous to prison security. Furthermore, the prison officials contend that the Church of Wicca is not a religion entitled to first amendment protection.

The "Wiccan Craeft," or "Church of Wicca," is an ancient faith which enjoyed a fairly substantial following in Northern Europe around the 10th and 11th centuries. Although the Craft declined in popularity and became much less visible with the growth of Christianity and various "witch hunts," the Church of Wicca has survived in isolated locations and has enjoyed a mod-est revival in popularity during the last few decades. There are currently an estimated 10,000—50,000 followers of the Church of Wicca in the United States.

Wiccans generally meet for worship in automonous groups known as covens. Specific principles of belief vary widely from group to group, depending upon the ethnic roots and traditions of the particular coven.[1] However, Wiccan followers are generally guided by a belief structure which appears to relate to "ultimate" concerns in a manner similar to the belief structures of more conventional religions. Other features of the group—its ceremonial use of meditation, prayer, incense, robes and candles, its worship of "gods," its emphasis on the spiritual development of its members, and its extensive literature and folklore— are not unlike features of other religious groups.

Plaintiff Dettmer first became acquainted with the Church of Wicca over six years ago by reading various pieces of literature about the organization. In 1982, Dettmer contacted a Wiccan organization for more information about the group, and has purchased a variety of materials from that organization over the past few years. It is clear from the uncontradicted testimony introduced at trial that Dettmer has been a sincere member of the Wiccan faith for about two years. Although Dettmer has had some isolated difficulties at Powhatan in receiving Wiccan literature, the prison has generally given Dettmer free access to the organization's books and pamphlets.

During the past two years, Dettmer has repeatedly sought permission to obtain certain items—sulfur, a hooded white robe, incense, candles, a timer, and a statue— that are essential to Wiccan worship services. Prison officials, understandably sensitive to potential security problems, denied each request, asserting that the items pose a threat to the security of the institution. For example, the prison officials stated

---

**1.** Although some extreme sects of the Wiccan church apparently engage in devil worship or "black witchcraft," Dettmer and the religious organization to which he belongs, as "white witches," are not associated with those sects.

that incense could be used to mask the odor of drugs, a statue could be used as a weapon, sulfur could be used to make gunpowder, and a hooded robe could be used to hide a prisoner's face in an escape attempt.

Recognizing that the prison officials had legitimate security concerns with several of the items, Dettmer consulted his religious leaders and offered to substitute sea salt or uniodized salt for the sulfur, to remove the hood from the robe, and to use a plastic statue rather than a wooden or ceramic one.[2] Dettmer also offered to perform his worship services in the chapel under the supervision of prison security officers at times most convenient to the prison. However, despite Dettmer's efforts to provide a workable solution, and even though officials never questioned the sincerity of Dettmer's beliefs, the prison still denied Dettmer access to the items. At the same time, prisoners worshipping more conventional religions such as Catholicism and Hinduism were given access to candles, incense, and crosses, and all prisoners were routinely given access to bathrobes and boxing robes.

### Conclusions of Law

Initially, the Court must determine whether the Church of Wicca is a "religion" for purposes of the first amendment. Each individual has a different, and often highly personal conception of a "religion," and the various religions of the world have their own unique, frequently complex system of beliefs and practices. Because religion is so highly personal and private, dealing with spiritual rather than temporal matters, courts have traditionally been reluctant to examine and pass judgment upon these beliefs. However, when confronted with a dispute between religious conviction and the needs of the state, courts have a duty to make at least some inquiry into the nature of the faith to ensure that purely secular beliefs and practices are not accorded the special protection afforded by the first amendment.

The first amendment of the Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This assertion reflects our nation's deeply rooted belief that private conscience and choice, not official coercion, must govern religious belief and conduct.[3] Such freedom of religious conviction, which must necessarily be extended to beliefs not shared by a large number of individuals, is the backbone of the pluralism essential to a healthy, diverse society.

In order to come within the protection afforded by the first amendment, the plaintiff must establish that his beliefs are "religious" in nature, or at least "arguably religious." *See International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430 (2nd Cir.1981); *see also* L. Tribe, American Constitutional Law § 14–6, at 828 (1978). Because the concept of a "religious belief" cannot be defined (and thereby limited) with any real precision, courts must accept a belief as "religious" so long as it is sincere, it occupies a meaningful position in the individual's life, and it relates to that individual's "ultimate concern." An individual's concerns may be described as "ultimate" when they go beyond purely intellectual matters of self interest to touch concerns that are in some sense "spiritual." The protection of the free exercise clause in no way depends upon the objective truth or veracity of the belief, nor upon the logic or consistency of the belief. *See Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *see also U.S. v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (analysis of term "religious belief" for purposes of statutory interpretation). While

---

**2.** While the "athame," or ceremonial dagger, is usually a part of Wiccan worship ceremonies, Dettmer recognizes that such an item could not be kept within a prison facility, and he does not seek access to that item.

**3.** Even though the distinction between religious beliefs and religious actions may be somewhat illusory, only the former is entitled to absolute protection. *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963).

the historical longevity, the number of devotees, and the existance of leaders, religious literature, ceremonies and holidays are not essential elements of a religion, they are factors that should not be ignored. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (Amish tradition).

With the above principles in mind, the Court thinks that the Church of Wicca is clearly a religion for first amendment purposes. Members of the Church sincerely adhere to a fairly complex set of doctrines relating to the spiritual aspect of their lives, and in doing so they have "ultimate concerns" in much the same way as followers of more accepted religions. Their ceremonies and leader structure, their rather elaborate set of articulated doctrine, their belief in the concept of another world, and their broad concern for improving the quality of life for others gives them at least some facial similarity to other more widely recognized religions. While there are certainly aspects of Wiccan philosophy that may strike most people as strange or incomprehensible, the mere fact that a belief may be unusual does not strip it of constitutional protection. Accordingly, the Court concludes that the Church of Wicca, of which the plaintiff is a sincere follower, is a religion for the purpose of the free exercise clause.

After concluding that the Church of Wicca is a religion protected by the first amendment, and that the items sought by the plaintiff are an essential and central part of Wiccan worship, the Court now turns to the second, more difficult inquiry—whether the prison's prohibition on candles, salt or sulfur, incense, a kitchen timer, and white robes impermissibly infringes upon Dettmer's right to freely exercise his religion. In order to overcome plaintiff's interest in practicing his religion, the state must show (1) a "compelling state interest" to justify the governmental interference with a religious practice; and (2) the unavailability of a less restrictive alternative which would adequately resolve the conflict. *Thomas v. Review Board*, 450

U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

In resolving free exercise claims of a person incarcerated in a penal facility, the Court recognizes as a preliminary matter that prison officials must be accorded some latitude in the administration of prison affairs. *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854 (4th Cir.1975) (prison authorities' refusal to allow prisoner to attend regular worship services with other prisoners, based upon the prison's security concerns, did not violate prisoner's constitutional rights when individual religious counselling was provided to the prisoner); *Ross v. Blackledge*, 477 F.2d 616 (4th Cir.1973). However, while prisoners may necessarily lose many privileges and rights as a consequence of their incarceration, an inmate is not stripped of all rights while imprisoned. A prisoner retains his right to freely worship while in prison, and restrictions on this right must be reasonably and substantially justified by legitimate considerations for prison discipline and security. If such regulations are overbroad or lacking in substance, they are unconstitutional. *Gallahan v. Hollyfield*, 670 F.2d 1345 (4th Cir.1982) (prison regulation requiring prisoners to have their hair cut at a certain length held unconstitutional as applied to a devout member of the Cherokee religious order whose religious tenets forbade him from cutting his hair).

The items which the defendant has refused Dettmer to possess here—salt or sulfur, a white robe, a candle, a statue, a timer, and incense—are an essential part of his Wiccan worship services. Defendant attempts to justify this prohibition by claiming that the items pose a threat to prison security. The Court finds that the asserted justifications for denying Dettmer these items are either overly broad or totally lacking in substance. While it is conceivable that a few of the items sought could be used for some nefarious purpose, the Court finds that the items pose no more of

a hazard to prison security and discipline than other items already available to prisoners, either for their own personal use or for worship purposes.

To the extent that any of the prison's asserted justifications are legitimate, they are not warranted in this instance because less restrictive alternatives are available to the state. Prison authorities may simply keep the controversial items in a safe location, and make them available to the plaintiff at reasonable intervals as plaintiff may require them, and under such supervision as the defendant believes is necessary to promote prison security.

Accordingly, defendant is hereby ENJOINED from denying plaintiff access to the following items, with the conditions as set out below:

(1): Sulfur, sea salt or uniodized salt: Because plaintiff has indicated that any one of these three items would be equally acceptable, the prison may designate which item plaintiff may be allowed to use.

(2): Quartz clock with alarm: Plaintiff has indicated that a quartz clock with an alarm would be an acceptable substitute for the kitchen timer, since prison officials expressed the concern that a timer could be used as a detonator.

(3): Candles.

(4): Incense.

(5): A white robe without a hood.

(6): The prison may take general custody of the above items, and simply make them available to the plaintiff at reasonable times for plaintiff's worship services, which the prison may supervise. The plaintiff has agreed to provide a secure box for the purpose of storing the items.