**Bill KOVACH and Tennessean Newspapers, Inc., Complainants,**

**v.**

**Jared MADDUX, Mickey McGuire, J. J. Jackson, H. D. Ross, Charles Graham, M. E. Kinchum, Delbert S. McCormac, Connie D. Smiley, Joe Williams, Bobby L. Wright, Vernon D. Edison, and Claude R. Greer, Defendants.**

Civ. No. 3997.

United States District Court
M. D. Tennessee,
Nashville Division.

Feb. 22, 1965.

John Jay Hooker, Jr., Henry W. Hooker, William R. Willis, Jr., and Alfred H. Knight, of Hooker, Hooker & Willis, Nashville, Tenn., for plaintiffs.

George F. McCanless, Atty. Gen. of Tennessee, Milton P. Rice and Thomas E. Fox, Asst. Attys. Gen. of Tennessee, for defendants.

William P. Rogers and William R. Glendon, of Royall, Koegel & Rogers, New York City, for American Society of Newspaper Editors, as amicus curiae, in support of plaintiffs.

E. Bruce Foster, of Frantz, McConnell & Seymour, Knoxville, Tenn., for Roy N. Lotspeich Pub. Co., publisher of the Knoxville Journal, Knoxville, Tenn., who was permitted to appear as amicus curiae and to adopt the brief of American Society of Newspaper Editors in support of plaintiffs.

Edwin F. Hunt, Harris A. Gilbert and Don R. Binkley, Nashville, Tenn., for Joe Pipkin and certain other members of the Tennessee Senate, amici curiae, in support of defendants.

WILLIAM E. MILLER, Chief Judge.

This action was instituted by the plaintiffs against the defendants, the Speaker and Sergeants-at-Arms of the Tennessee State Senate, to have declared void and to enjoin the enforcement of a Senate resolution conditionally excluding the plaintiffs or their representatives from the floor of the Senate for the remainder of its present session. The plaintiff, Tennessean Newspapers, Inc., a Tennessee corporation, is engaged in the publication of the Nashville Tennessean, a daily morning newspaper having a week-day circulation of approximately 138,000, and having a Sunday circulation of 220,000. It has the largest daily circulation within the state of any Tennessee newspaper. Geographically its circulation covers more than sixty of the ninety-five Tennessee counties and portions of Alabama and Kentucky. The plaintiff, Bill Kovach, is employed as a reporter for the Nashville Tennessean and has been currently assigned to cover the proceedings of the State Senate during the 84th General Assembly which convened January 4, 1965.

On February 6, 1965, the Court issued a temporary restraining order, effective for five days, enjoining the defendants from enforcing the exclusion resolution. At the same time the plaintiffs' motion for a preliminary injunction was set down for a hearing on February 10, 1965. At the hearing on that date the defendants, represented by the Attorney General of the State, filed an answer on their behalf resisting the relief sought. By consent of all parties the hearing was treated as a final hearing on the merits, with the result that the issue now before the Court is whether a permanent injunction should issue to enjoin enforcement of the resolution in question. The evidence was duly presented and made a part of the record by stipulation, consisting of a number of affidavits and pertinent exhibits.

The immediate events which gave rise to the controversy occurred on February 3, 1965. On that date the plaintiff Kovach was present, along with representa-

tives of other newspapers, at an open meeting of the Senate Committee on Local Government while it was considering and debating a so-called "Little Hatch Act" for state employees. After some discussion and debate on the bill, a member of the Committee moved that the bill be moved to the floor of the Senate for passage, a motion which was duly seconded. At that time another member of the committee stated that the week before a rule had been adopted by the committee which provided in effect that the committee should vote on bills in secret session. He requested that this rule be invoked. The Chairman agreed and accordingly requested that the committee room be cleared of all persons other than members of the committee. Kovach, acting on instructions from the Editor of his newspaper, refused to leave unless he was requested to do so by a Sergeant-at-Arms, taking the position that secret sessions, under the circumstances, were in violation of the freedom of the press. A reporter for the Knoxville News Sentinal, Dana-Ford Thomas, at first left the committee room when the Chairman asked that it be cleared but returned when he saw that Kovach was not leaving. A lengthy discussion ensued concerning the appropriate course of action to follow and Thomas was granted permission to make a statement. He expressed his opposition to secret sessions and his belief that they constituted an abridgement of the freedom of the press. He stated once again that while he was leaving he was doing so under protest and without the assistance of a Sergeant-at-Arms. At this juncture it was decided to remove Kovach by calling a Sergeant-at-Arms. However, for some reason which is not made clear in the record, a Sergeant-at-Arms could not be located and the committee accordingly adjourned until the next day.

On the following day, February 4, the Senate, after receiving an oral report from the Speaker as to the occurrences in the Local Government Committee on the preceding day, suspended its rules and adopted Senate Resolution No. 9, which reads as follows:

"BE IT RESOLVED by the Senate of the State of Tennessee that all representatives of the NASHVILLE TENNESSEAN are hereby denied access to the floor of the Senate for the remainder of the Session of the 84th General Assembly as a result of the defiance by the representatives of that publication on February 3, 1965 of the rules of the Senate and the ruling of the Chairman of the Committee on Local Government in enforcement of its orderly procedures.

"This order will remain in effect until such time as the publisher of the offending publication by letter informs the Clerk of the Senate that · the offending publication's representatives will henceforth abide by the rules of this body."

The Senate then adjourned until the following day, February 5. On that date, when Kovach and other newsmen representing the Nashville Tennessean, presented themselves at the Senate door they were refused admission by the Chief Sergeant-at-Arms, although reporters, photographers and representatives of other newspapers and news media were admitted in the customary manner. Representatives of the Nashville Tennessean have been admitted to the press section of the Senate floor since February 6, 1965, under and pursuant to the terms of the temporary restraining order, later extended until February 20, 1965.

The complaint alleges that Senate Resolution No. 9 "represents an unreasonable prior restraint upon plaintiffs' freedom of the press and freedom of speech and is itself unconstitutional and void under the First and Fourteenth Amendments to the United States Constitution * * *." It is further alleged that the said Resolution and the defendants' action in enforcing it also deprived the plaintiffs of equal protection of the law in that the defendants were denied access to the Senate Chamber, although·

such access was granted reporters representing other newspapers and news media. It is alleged that "there was no reasonable basis for discriminating against them in this regard" and that the actions of the defendants constituted an invalid attempt to impose a condition precedent upon plaintiffs' exercise of freedom of the press and freedom of speech.

■ Since the complaint clearly sets forth a case arising under the First and Fourteenth Amendments to the Constitution, the subject matter is within the federal judicial power defined under Art. III, Sec. 2, and within the jurisdiction of district courts. Baker v. Carr, 369 U.S. 186, 200, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Jurisdiction has been assigned by Congress under 28 U.S.C.A. § 1343(3):

> "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person * * * [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States * * *."

As pointed out in Baker v. Carr, the Supreme Court has frequently sustained district court jurisdiction under 28 U.S.C.A. § 1343(3) or its predecessors to entertain suits to redress the deprivation of rights secured against state infringement by the equal protection and due process clauses of the Fourteenth Amendment.

The Court is of the opinion that it has undoubted jurisdiction of the subject matter of the federal constitutional claims asserted in the complaint.

■ The First Amendment to the Constitution of the United States provides, insofar as pertinent here, that "Congress shall make no law * * * abridging the freedom of speech or of the press." By the operation of the due process clause of the Fourteenth Amendment the guarantees of the First Amendment are made applicable as prohibitions against the state. Bridges v. State of California, 314 U.S. 252, 263, 62 S.Ct. 190, 86 L.Ed. 192 (1941); Cantwell v. State of Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Thornhill v. State of Alabama, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

The Supreme Court has made it clear in numerous cases that the basic freedom of speech and of the press is one of the cornerstones of our democratic form of government. As recently as 1964 in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in holding that freedom of the press and of speech carries with it the right, without malice, to criticize the official acts of public officials, the Court reaffirmed this fundamental principle in no uncertain terms.

> "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Roth v. United States, 354 U.S. 476, 484 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498]. 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' Stromberg v. [People of State of] California, 283 U.S. 359, 369 [51 S.Ct. 532, 536, 75 L.Ed. 1117]. 'It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions,' Bridges v. [State of] California, 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192, and this oppor-

tunity is to be afforded for 'vigorous advocacy' no less than 'abstract discussion'. N. A. A. C. P. v. Button, 371 U.S. 415, 429 [83 S.Ct. 328, 9 L.Ed.2d 405]."

Eloquent expression has been given of the inherent and basic value of this freedom and its indispensability in preserving the democratic process by such notable figures in Anglo-Saxon legal and political history as Blackstone, Hamilton, Jefferson and Madison, to name only a few. The freedom with which we are here concerned has been universally recognized as including the right of the press to have access to the open sessions and proceedings of legislative assemblies. Without the opportunity to gather and obtain the news, the right to publish or to comment upon it, would be of little value. Indeed, the Constitution of Tennessee in two separate sections makes this right of access altogether clear. Thus, Article I, Sec. 19 of the Constitution of Tennessee provides:

"Freedom of speech and press.— That the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

And Article II, Section 22 provides:

"The doors of each House and of committees of the whole shall be kept open, unless when the business shall be such as ought to be kept secret."

In recognition of these principles, Senate Rule 67 of the 84th General Assembly requires the Sergeant-at-Arms to admit into the Senate Chamber certain enumerated state officers and also "reporters properly authorized to represent the various newspapers of the country," all visitors and spectators being assigned by the same rule to the gallery.

In safeguarding the essential freedom of speech and of the press, the Courts have with few exceptions frowned upon previous restrictions and restraints upon the right of free publication. A leading case on this point is Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), in which it was held that the chief purpose of the guaranty of speech and of the press of the First Amendment is to prevent previous restraint upon publication. However, this does not mean that all previous restraints are prohibited. The question is a relative one to be answered in the context of individual cases in order to reconcile and accommodate the interest which the public has in preserving a free press as well as other legitimate interests with which such freedom may clash or come in conflict. As stated by the Supreme Court in Near v. State of Minnesota, supra at 715–6:

"The objection has also been made that the principle as to immunity from previous restraint is stated too broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases."

The Court further said at 718:

" 'In every State, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men of every description which has not been confined to the strict limits of the common law. On this footing the freedom of the press has stood; on this footing it yet stands. * * * Some degree of abuse is inseparable from the proper use of everything, and in no instance is this more true than in that of the press. It has accordingly been decided by the practice of the States, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding the proper

fruits. And can the wisdom of this policy be doubted by any who reflect that to the press alone, chequered as it is with abuses, the world is indebted for all the triumphs which have been gained by reason and humanity over error and oppression; who reflect that to the same beneficent source the United States owe much of the lights which conducted them to the ranks of a free and independent nation, and which have improved their political system into a shape so auspicious to their happiness? Had "Sedition Acts," forbidding every publication that might bring the constituted agents into contempt or disrepute, or that might excite the hatred of the people against the authors of unjust or pernicious measures, been uniformly enforced against the press, might not the United States have been languishing at this day under the infirmities of a sickly Confederation? Might they not, possibly, be miserable colonies, groaning under a foreign yoke?' "

■ As broad as freedom of speech and of the press is as guaranteed by the First Amendment and as developed in our legal and political history, a vital state interest is involved in the present case which must be given consideration. This is the right of a state legislative body to conduct its proceedings according to orderly procedures free from interference or obstruction by non-members. The right and power of a state legislature to protect itself against contemptuous and disorderly conduct on the part of non-members cannot be disputed. This right is specifically guaranteed in the State Constitution which provides in Article II, Sec. 14, that "each House may punish by imprisonment, during its session, any person not a member, who shall be guilty of disrespect to the House, by any disorderly or any contemptuous behavior in its presence." Doubtless this right to punish for contempt does not define the full limit of protective measures to which a legislative body may

resort. For example, it possesses the authority to order the removal of any disorderly person from its meeting places and to enforce such removal, if necessary, through its Sergeants-at-Arms. This power is essential to a legislative body and is one which arises from necessity.

■ It is true that Kovach, as shown by the evidence, was guilty of disrupting the orderly proceedings of the Senate Committee on Local Government in refusing to leave the Committee room at the request of its Chairman. It is also true that this was done, as Kovach states in his affidavit, because he was acting under the orders and directions of the Editor of his newspaper to refuse to leave any committee meeting when its proceedings were to be conducted in secret session until he was requested to leave by a Sergeant-at-Arms. The evidence also shows that the publisher of the Nashville Tennessean had issued general instructions to his reporters covering the proceedings of the General Assembly to conduct themselves in a like manner to protest the holding of any secret or executive meeting of committees on routine legislation, his position being that such meetings were illegal under state and federal constitutional provisions. While the plaintiff newspaper had the unquestioned right in its columns, on its editorial pages, and in other appropriate ways to take such a position, and to speak out against and to express opposition to secret sessions on the part of legislative committees, it had no right to carry its opposition to the extent of refusing to leave a committee meeting at the request of its chairman. It had no right to offer any physical obstruction whatever to the processes of the Senate or its committees. This much must be conceded.

■ Under the circumstances with which it was confronted, the Senate possessed the clear right to adopt proper measures and to take appropriate steps to protect itself. It could have excluded, through its Sergeants-at-Arms, all reporters and newspaper representatives

from the room of any committee desiring to hold a secret or executive session. This is a direct, simple, and effective method to conduct its proceedings in an orderly fashion and to remove any obstruction to the operation of its rules. On the present record, while it is indicated that the Sergeant-at-Arms could not be located at the moment on February 3, when the Local Government Committee desired to go into secret session, the inference appears to be altogether clear that any threat which the Nashville Tennessean posed to the State Senate in the future in holding executive committee sessions could have been effectively met, dealt with, and overcome by invoking its power of exclusion through its Sergeants-at-Arms. Indeed, eleven Sergeants-at-Arms are named as defendants in the present complaint, and under Senate Rule 9 the Speaker of the Senate is vested with the power to appoint such Sergeants-at-Arms "as are necessary for the proper transaction of the business of the Senate." In addition to such power of exclusion of offending persons, including members of the press if they should engage in disorderly or contemptuous conduct or in any manner disrupt the proceedings of the Senate or its committees, the Senate could have invoked its constitutional power to imprison for contempt if it deemed the offense to be of such gravity as to pose a serious threat. But instead of resorting to these acceptable and clearly valid methods of enforcement which would have avoided any interference with the freedom of the press and the free flow of news, the Senate adopted Resolution No. 9 banishing, on certain conditions, the plaintiff Kovach and all representatives of the Nashville Tennessean from the Senate floor for the remainder of the session.

Before analyzing the terms of the Resolution, it is necessary to have in mind the physical facts with respect to the Senate floor and gallery. As shown by the undisputed evidence in the present case, the Senate has very generously provided an excellent press section on the floor of the Senate to accommodate a number of newspaper reporters and representatives. The press section faces the Senate seats and is on the same floor level, affording a view of the entire Senate Chamber. It is in the shape of a semi-circle, located immediately below the Clerk's desk, which in turn is below the Speaker's chair. The space is utilized by all members of the press, including the wire services, such as United Press International and Associated Press, as well as by radio and television and news reporters. It affords immediate access to the votes on Senate bills which are electronically recorded, and each assigned seat has a telephone and space for a typewriter. Also immediately available to reporters are copies of bills and resolutions as they are introduced. This arrangement has been in existence for many years and the Nashville Tennessean was assigned one of the seats in the area. A reporter undertaking to cover proceedings of the Senate from the gallery would be at a serious, if not impossible, disadvantage. Due to the physical features of the Senate Chamber and the location and size of the gallery, he would have only a limited view of the Senate floor and the members of the Senate. He would be without access to copies of Senate bills or resolutions as they were introduced, and without access to a telephone. In addition, he would be far removed from the members of the Senate and denied the opportunity to discuss any matters with them on the floor during periods of recess, to say nothing of the fact that he would be denied any access to the Senate gallery itself if it should happen to be filled with spectators before he arrived. It could hardly be denied under the circumstances that a banishment of a newspaper from the Senate floor and its relegation to the gallery is in fact a substantial impairment and denial of its opportunity to gather the news as it occurs during the course of the deliberations of the Senate.

Turning to Senate Resolution No. 9, it is to be observed that it not only

removes the Nashville Tennessean and all of its representatives from the Senate floor, but it does so under terms which for all practical purposes make it impossible for them to obtain readmission. It is apparent from the terms of the Resolution that it was intended to be, and in fact is, a punishment of the plaintiffs for the conduct of Kovach in refusing to leave the meeting of the Committee on Local Government on February 3, 1965, when requested to do so by its Chairman. It is recited in the Resolution "that all representatives of the Nashville Tennessean are hereby denied access to the floor of the Senate for the remainder of the session of the 84th General Assembly as a result of the defiance by the representatives of that publication on February 3, 1965 of the rules of the Senate and the ruling of the Chairman of the Committee on Local Government in enforcement of its orderly procedures." The intent and purpose of the Resolution are thus indelibly stamped on the face of the Resolution itself. Denial of convenient access to the source of news on the Senate floor is inflicted as a punishment for what the Senate considered to be contemptuous conduct. While at first glance the condition precedent set forth in the Resolution for readmission to the Senate floor would appear to be relatively innocuous, closer examination and analysis disclose that this is far from true. The publisher of the "offending" publication is required to write a letter to the Clerk of the Senate "that the offending publication's representatives will henceforth abide by the rules of this body." It is thus required that the publisher furnish to the Senate not simply a letter withdrawing instructions to his reporters not to leave secret committee sessions, but containing an unconditional pledge and guarantee that his representatives will at all times thereafter "abide by" the rules of the Senate. Any infraction of a Senate rule, however slight and inconsequential, by any one of a number of newsmen representing plaintiff, and whether done knowingly or inadvertently,

could, under the terms of the Resolution, subject the Tennessean to a further revocation of access to the Senate floor, or to some other form of punishment which is not spelled out or delineated in the Resolution. This would be true with respect to existing rules, whether written or unwritten, known or unknown, and it would be true with respect to any future rules adopted by the Senate or any of its committees, whether written or oral, or known or unknown to the plaintiff newspaper or its representatives. It is difficult to see how any publisher could commit himself to such a pledge with any degree of understanding as to what it meant or as to what the future consequences would be, especially in the tense atmosphere now existing.

In addition, there is a serious question under the Resolution as it is worded whether the publisher is not required as a condition to obtaining re-entry to the Senate floor and access to the news to surrender his right to protest, criticize and adversely comment upon Senate rules which he deemed to be unwise or unconstitutional. The Resolution does not require simply that the newspaper and its representatives shall "obey" Senate rules in the sense that they shall not offer any physical resistance to or interference with their enforcement. Nor does it simply require a "compliance" with Senate rules. The requirement is that the newspaper and all of its representatives shall "abide by" all rules of the Senate, words which may be construed to include not only obedience and compliance in the physical sense, but also general acquiescence in and acceptance without protest or opposition of any type. While the words "abide by" may possibly have been intended in the present Resolution to require only physical obedience and non-resistance, the fact remains that the terms at least pose a threat of a much broader application. Webster's Unabridged Dictionary, (2nd Edition, 1941) defines "abide by": "To stand to; to adhere to; to acquiesce in; to conform to; to accept as valid and to take the consequences of; as to abide by a deci-

sion." In committing himself to the terms of the Senate Resolution, a publisher would have to ask himself whether he was not in fact surrendering his right of verbal protest and opposition to the entire body of Senate rules, including those pertaining to secret or executive sessions. If he must "acquiesce in" and "accept" these rules "as valid," he may find himself in contempt of the Senate if he vigorously protested the secret session rule, for example, in the legislative hall outside the Senate Chamber, or by circulating handbills in opposition to it to the members of the Senate. By the very vagueness of its terms the Resolution creates a deterrent to the free and unfettered expression of ideas, views, and opinions which the First Amendment, as construed by the Supreme Court, was designed to inhibit. Since the Resolution is restrictive of the freedom of speech and of the press, the usual presumption in favor of validity of legislation does not prevail. As a corollary, the rule that statutes in case of doubt will be construed to save their constitutionality is also without application.

Senate Resolution No. 9 places upon the publisher a harsh alternative, either to surrender his opportunity to be represented on the floor of the Senate along with other newspapers and representatives of other news media, or to commit himself to a pledge of uncertain scope, extent, and meaning which might very well be construed by the Senate as requiring complete submission to all Senate rules without criticism and without protest. It cuts off the source of news to an entire newspaper as a punishment for contempt of the Senate. At the same time it holds out a threat that a surrender of freedom of expression may be required as the price to be paid for regaining such access to the source of news. It thus constitutes in a double sense a burden upon freedom of speech and of the press.

In Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941) the Court was concerned with the power of a court to punish a newspaper for contempt of court for an out-of-court publication concerning a pending case. The Court applied the "clear and present danger" test in holding that under the circumstances of the particular case the punishment imposed was inhibited by the freedom of speech and press guaranty of the First Amendment. While the exact problem in that case is not the same as the one here presented, the decision and the opinion of the Court are indicative of the broad scope of the First Amendment privileges. Thus it was pointed out that "the likelihood, however great, that a substantial evil will result cannot alone justify a restriction upon freedom of speech or the press," and further that the First Amendment prohibition against any law abridging freedom of speech or of the press "must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society will allow." The scope of the protection, as the opinion clearly and distinctly points out, is much broader and the protection afforded to freedom of speech and of the press is much greater under the First Amendment than it was in England at the time of the adoption of the Constitution, or as it existed at common law. The guiding principles for decision in this case were plainly delineated by the Supreme Court in Thomas v. Collins, 323 U.S. 516, 529, 65 S.Ct. 315, 89 L.Ed. 430 (1945):

> "The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. Schneider v. State [of New Jersey], 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155]; Cantwell v. [State of] Connecticut, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352];

Prince v. [Com. of] Massachusetts, 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645]. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. Compare United States v. Carolene Products Co., 304 U.S. 144, 152–153 [58 S.Ct. 778, 783, 784, 82 L.Ed. 1234].

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation."

■ On the facts of the case now before the Court, the restriction upon the freedom of the press and the denial of access to the news imposed by Senate Resolution No. 9, go far beyond any reasonable measures required to protect the Senate in the discharge of its duties or to preserve its dignity and decorum. The teaching of Bridges v. State of California and Thomas v. Collins plainly is that a restriction upon the First Amendment's privilege and freedom of speech is not to be sanctioned unless the danger to a legitimate state interest is serious, direct and immediate. Even then, the restriction itself must be confined within reasonable limits and must not go beyond the needs of the occasion. Senate Resolution No. 9 was not only unnecessary but it went far beyond a requirement that the publisher desist in his efforts to offer physical obstruction to or interference with Senate committee sessions. It not only deals with the entire body of rules of the Senate, written or oral, now existing or hereafter adopted, but, as pointed out, it requires a pledge of submission to Senate rules of such broad and undefined range and scope that no publisher could agree to it without running a serious risk of forfeiting his freedom of expression. All of this is laid down as a condition to enjoy the privileges of the Senate floor and the press section which are extended freely and generously to all other newspapers and news media. To sanction such a use of state power would be to take a dangerous step toward press control and censorship which could very well lead to other and greater controls.

Even if the conduct of Kovach on February 3 and the instructions given by the Tennessean to its reporters not to leave secret committee sessions posed a threat to the processes of the Senate, it would plainly be encumbent upon the defendants, to use the words of the Supreme Court in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, "to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." In that case the Court measured the permissible scope of a state regulation in terms of the freedom of religion guarantee of the First Amendment, but the principle involved would appear to be identical. In the instant case the defendants have not demonstrated that alternative forms of regulation, not materially infringing First Amendment liberties, would not have combatted the abuses with which the Senate was confronted. Nor has it been demonstrated that the abuse or danger was so great that a restriction on freedom of speech or of the press in the broad and almost limitless terms of Senate Resolution No. 9 was required to meet or combat it.

It is of no significance in the constitutional sense that the plaintiffs may have occupied a place on the Senate floor, as

distinguished from the gallery, as a matter of "privilege" and not as a matter of strict legal right. In the first place whether it is a matter of right or privilege to have a place in the press section on the Senate floor, it cannot be plausibly denied that the interest involved insofar as a newspaper is concerned is one of real if not indispensable value. It gives direct, immediate and effective access to an important and vital source of state news. Denial of such an opportunity, as already pointed out, would place a serious handicap and burden upon any newspaper which could not be materially alleviated by access to the Senate gallery. Secondly, in the present case denial of access to the Tennessean and its representatives was not imposed because it was necessary or even convenient for the Senate in conducting its proceedings in the Senate Chamber; nor was it imposed because limitations of space necessitated an allocation among different news media. As shown on the face of the Resolution it was imposed for one reason and for one reason only, as a punishment for one newspaper for what the Senate considered to be contemptuous conduct before one of its committees. Thirdly, "it is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794 (1963); Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); American Communications Ass'n v. Dowd, 339 U.S. 382, 390, 70 S.Ct. 674, 94 L.Ed. 925 (1950). To condition the availability of the conveniences and advantages of the press section of the Senate floor upon the plaintiff newspaper pledging itself to a condition which virtually requires it to surrender any opposition to Senate rules effectively and substantially deters the plaintiffs from the free exercise of constitutional liberties of expression and comment.

The argument that plaintiffs were not substantially punished because they could obtain Senate news from the wire services is untenable. It has the right to rely upon and use its own representatives to gather, report, and interpret the news, otherwise it would enjoy little independence.

■■ While the defendants do not urge the application of the abstention doctrine or the doctrine of unclean hands, it is argued in an amicus curiae brief tendered on behalf of certain members of the Tennessee Senate that these doctrines have application in this case. However, the Supreme Court has indicated that these doctrines have little application in actions involving the denial of civil rights. Without discussing in detail the authorities cited in the amicus curiae brief and in the defendants' brief in opposition thereto, the Court is of the opinion that no sound reason has been advanced why this Court should stay its hand or apply the doctrine of unclean hands. Several considerations lead to this conclusion:

(1) The application of Senate Resolution No. 9 to the plaintiffs is clear and unmistakable;

(2) The denial of a federal constitutional right is direct and immediate;

(3) It is not necessary that any unsettled question of state law be determined in deciding the federal constitutional claim; and

(4) The doctrine of unclean hands, while having application upon a proper state of facts in litigation between private litigants involving private interests, should not be applied where the result would be a refusal to enforce a claim in which the public has a direct and substantial interest.

The ruling herein does not involve, as suggested, a federal court in the assignment of newspaper space on the floor of a state senate. The problem here is not one of assignment of space but the revocation of a privilege under conditions infringing a right occupying a preferred constitutional status—an infringement not required to combat any abuse or to

846

meet any threat with which the State Senate was confronted.

Since the Court is of the opinion and view that Senate Resolution No. 9 is void under the First and Fourteenth Amendments to the Federal Constitution, it is unnecessary to discuss the equal protection claim advanced by the plaintiffs or the claim that the Resolution constitutes a bill of pains and penalties in violation of the due process clause. Nor does the Court deem it necessary to discuss other points advanced by the defendants in opposition to the plaintiffs' claim.

In disposing of the case, the Court has considered the briefs of the parties, the amicus curiae brief of the American Society of Newspaper Editors, and, in addition, the amicus curiae brief tendered on behalf of certain members of the Tennessee Senate. Accordingly an order will be presented to the Court permitting the latter brief to be filed and overruling the defendants' motion in opposition to its filing.

A form of judgment will be submitted to the Court in accordance with this opinion declaring Senate Resolution No. 9 to be null and void and permanently enjoining its enforcement.