The Honorable Beverly Pyle State Representative
1017 Dorothy Drive Cedarville, Arkansas 72932-9501
Dear Representative Pyle:
I am writing in response to your request for an opinion regarding several questions you pose about carrying a concealed handgun. You ask seven questions, but I have combined and paraphrased your sixth and seventh:
 1. Does A.C.A. [§ ] 5-73-306(a)(16), which prohibits concealed carry licensees from carrying a concealed handgun into a church, violate the Free Exercise of Religion Clause of the First Amendment to the United States Constitution?
 2. Does A.C.A. [§ ] 5-73-306(a)(16), which prohibits concealed carry licensees from carrying a concealed handgun into a church, violate the Establishment of Religion Clause of the First Amendment to the United States Constitution?
 3. Does A.C.A. [§ ] 5-73-306(a)(16), which prohibits concealed carry licensees from carrying a concealed handgun into a church, violate the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (42 U.S.C. 2000cc et seq.)?
 4. If your answer is yes to any of the above questions, what effect does that have on the enforcement of A.C.A. [§ ] 5-73-306(a)(16)? *Page 2 
 5. Does enforcement of A.C.A. [§ ] 5-73-306(a)(16) create a cause of action and potential civil liability for a civil rights violation by the government entity that attempts to enforce the statute?
 6. Suppose a landowner or possessor of a land permits his or her guests or licensees to carry handguns on the landowner or possessor's land. Does A.C.A. § 5-73-120(c)(1) provide a defense to prosecution of such a guest or licensee?
RESPONSE
Your first two questions are issues of first impression because no court, in Arkansas or elsewhere, has addressed them. For the reasons indicated in the discussion below, a comprehensive answer involves analyzing several discreet legal issues, any one of which could, under certain conditions, render the statute unconstitutional. Most of those discreet legal issues involve finding facts. Because I cannot be a fact finder when issuing opinions, I cannot analyze the set of legal issues that require factual determinations. Therefore, this limitation renders my conclusions partial and tentative. With the limited nature of my review in mind, it is my opinion that if a court were to consider the single legal issue I am able to analyze, it would likely uphold A.C.A. § 5-73-06(a)(16) (Supp. 2009) under both the Free Exercise Clause and Establishment Clause of the First Amendment to the United States Constitution. As for your third question, in my opinion, as explained more fully below, a court would probably hold that subsection 5-73-306(a)(16) does not violate the Religious Land Use and Institutionalized Persons Act (RLUIPA) because subsection 5-73-306(a)(16) is not a land-use regulation within RLUIPA's scope. Given my conclusions in response to your first three questions, your fourth and fifth questions are moot. The answer to your sixth question is "no," because the wording of A.C.A. § 5-73-120(c)(1) indicates that the defense to prosecution is for possessors themselves, not possessors' guests or licensees.
DISCUSSION
Because five of your six questions deal with section 5-73-306, it will be helpful to quote its relevant provisions: "No license to carry a concealed handgun issued pursuant to this subchapter authorizes any person to carry a concealed handgun into . . . [a]ny church or other place of worship. . . ." A.C.A. § 5-73-306(a)(16) (Supp. 2009). *Page 3 
 Question 1: Does A.C.A. [§ ] 5-73-306(a)(16), which prohibitsconcealed carry licensees from carrying a concealed handgun into achurch, violate the Free Exercise of Religion Clause of theFirst Amendment to the United States Constitution?
Your precise question has never been addressed by any state appellate court, federal court at any level, or Attorney General Opinion in any state.[1] Accordingly, your question is very much an issue of first impression and my opinion relies on analogous case law and scholarly commentary.
The question necessitates a review of modern free-exercise law, which is a mixture of two Supreme Court cases and two different federal statutes. The following briefly explains the development of free-exercise law, culminating in an analysis of what law governs your question.
The modern Supreme Court interpretation of the Free Exercise Clause effectively began in the 1963 case of Sherbert v.Verner, 374 U.S. 398. In Sherbert, a Seventh-day Adventist was fired because she refused to work on Saturday. Her refusal was motivated by her religious belief that she was required to avoid work on Saturdays. Her application for unemployment compensation was denied because, to receive unemployment benefits, her state's law required a person be "available to work."Id. at 400. The administrative panel who rejected her application found that Sherbert's unwillingness to work on Saturdays meant she refused suitable work. She sued to overturn the panel's decision, arguing that it violated her free-exercise rights.
The Supreme Court agreed with Sherbert. The Court held that the employment law, when applied to her, "force[d] her to [choose] between following the precepts of her religion and forfeiting [unemployment] benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." Id. at 404. This type of forced decision, the Court held, "puts the same kind of burden upon free exercise of religion as would a fine imposed *Page 4 
against" Sherbert for worshiping on Saturday. Id. As a consequence of this burden on free exercise, the Court analyzed the law under strict scrutiny, which required the government to show that its legislation furthered a compelling government interest and was narrowly tailored to achieve that aim. Id. at 406. In summary, Sherbert established a very high standard of review — strict scrutiny — for laws that impinged on a citizens' religious exercise. For nearly the next thirty years, the Court applied Sherbert in free-exercise challenges with some statutes failing the review[2] and others passing the review.[3]
In 1990, the Court abandoned the Sherbert test.Employment v. Smith, 494 U.S. 872. Kent Greenawalt,Religion and the Constitution: Free Exercise and Fairness
vol. 1, 31 (Princeton Univ. Press 2006). In Smith, the Court considered whether an Oregon drug law violated the religious exercise of two Native Americans. The law prohibited certain drugs, including a hallucinogenic called peyote. Id. at 874. The two men ingested peyote "for sacramental purposes at a ceremony of the Native American Church, of which both are members." Id. Later, they were both fired from their jobs at a private drug-rehabilitation clinic. Their subsequent applications for unemployment compensation were denied because the two men "were determined to be ineligible for benefits because they had been discharged for work-related "`misconduct.'" Id. The two men sued alleging that the drug law violated their free-exercise rights under the First Amendment.
The Court disagreed with the two men. The Court held that when a law is neutral and generally applicable, the law does not violate the Free Exercise Clause even though it may burden a person's exercise of their religion. The Court cautioned, however, that if a law was targeted at a specific religious group or religious practice, the law would be subject to strict scrutiny.Id. at 877-78.[4] The Court noted two exceptions to the lesser standard-of-review that would retain the Sherbert
strict-scrutiny analysis. Both exceptions will be evaluated more fully below. *Page 5 
Before discussing those exceptions, however, I should note howSmith spurred Congress's involvement in modern free-exercise law. Because Congress believed Smith eroded important constitutional protections of religious rights, Congress passed the Religious Freedom Restoration Act (RFRA). Congress intended the RFRA, which specifically returned to Sherbert standard, to apply to all levels of government.
In 1997, the Supreme Court had its first opportunity to review the constitutionality of RFRA in City of Boerne v. Flores.521 U.S. 507. The Court held that the RFRA was unconstitutional to the extent it applied to states and municipalities. To that extent, the Court invalidated RFRA's attempt to return to theSherbert standard. The Court was not clear about whether the RFRA was constitutional as applied to the federal government. In 2005, however, the Court made clear that RFRA was constitutional as applied to the federal government. Cutter v. Wilkinson,544 U.S. 709. Congress replied to the Court's partial invalidation of RFRA by passing the Religious Land Use and Institutionalized Persons Act, which is discussed below.
Having explained the development of modern free-exercise law, I can settle on what law applies to your question. Because your question is about state law, and the RFRA does not apply to state law, the RFRA will not apply to your question. Therefore, the standards elaborated in Smith apply.[5] I should note, however, that to the extent Smith leaves some questions unanswered or unclear, this opinion will look to both the Eighth Circuit Court of Appeal's interpretation of Smith and scholarly commentary.
Given that Smith applies to your questions, a more detailed analysis of its holding is warranted. The general rule established in Smith is that the Free Exercise Clause does not require that a religious practitioner be exempt from a neutral and generally applicable law. This is true even if the law substantially interferes with religiously motivated conduct. The Smith court did not elaborate much on the key phrase `neutral and generally applicable law.' Consequently, the necessary and sufficient conditions for the test remain unclear. *Page 6 
While the Court in a subsequent case treats the terms as two separate tests, [6] the Eighth Circuit Court of Appeals appears to have taken a more narrow view of the phrase. In Olsen v.Mukasy, the Eighth Circuit Court of Appeals takes a dichotomous view of the Smith test: "Absent evidence of an `intent to regulate religious worship,' a law is a neutral law of general applicability." 541 F.3d 827, 832 (8th Cir. 2008) (internal citations omitted). Under Eighth Circuit jurisprudence, then, if a law is not specifically targeted at a religious practice, the law is neutral and generally applicable.[7]
Three years after Smith, the Court elaborated on how to determine whether a law targets a religious practice. Church ofthe Lukumi Babalu Aye v. Hialeah, 508 U.S. 520, 531 (1993). InLukumi, the Court analyzed the challenged law in two ways: the law's text[8] and the law's object.[9] The Court evaluated the latter by reference to several factors: the law's effect "in its real operation," statements made by and to the city council members who enacted the challenged law, the "events preceding the law's enactment," the historical background of the decision under challenge, and legislative or administrative history.[10]
As noted above, the Smith court fashioned two exceptions to its general rule.[11] If either exception applies, then the law is subject to strict scrutiny. The first *Page 7 
exception, which is not relevant to our purposes here, is for individualized exemptions from unemployment compensation systems. The second exception is for so-called, "hybrid rights."[12] Under this exception, the Smith court held that when petitioners claim that a law violates both their free-exercise rights and some other constitutionally protected right, the law will be subject to strict scrutiny. Smith, 494 U.S. at 881-83.
I cannot assess whether, in the abstract, this exception would apply to your questions for two reasons. First, the breadth of the exception itself is unclear and has been subjected to significant criticism by many scholars and courts have rarely found such a hybrid situation.[13] Second, whether any such hybrid-rights situation applies would be highly fact specific. Absent sufficient facts, I cannot opine about the exception's applicability.
In addition to the substantive law discussed above, other rules governing how statutes are interpreted also apply to your question. Statutes are presumed constitutional, and the challenger bears the burden of proving otherwise. E.g., Ford v.Keith, 338 Ark. 487, 996 S.W.2d 20 (1999). If it is possible to construe a statute as constitutional, courts must do so. E.g.,Jones v. State, 333 Ark. 208, 969 S.W.2d 618 (1998). Additionally, when construing a specific portion of a statute, courts must interpret the portion in the context of the statute as a whole. E.g., Green v. Mills, 339 Ark. 200, 4 S.W.3d 493 (1999). Courts will also presume that the General Assembly was fully aware of three things: the scope of its powers, prior legislation on the same subject, and judicial decisions under preexisting law.E.g., McLeod v. Santa Fe Trail Transp. Co.,205 Ark. 225, 168 S.W.2d 413 (1943). The principle job of courts when interpreting statutes is to give effect to the legislature's intent by reference to the common sense, ordinary meaning of a statute's words. E.g., Kyle v. State,312 Ark. 274, 849 S.W.2d 935 (1993).
Before applying the substantive law and statutory-construction rules to subsection 5-73-306(a)(16), I must note the limited nature of my review. I am not authorized *Page 8 
or equipped to make factual determinations when issuing opinions. Under Smith and Lukumi, whether a law passes theSmith test may depend on key factual determinations.[14]
Further, the Court has specifically made clear that when courts evaluate whether a law violates the religion clauses, the courts must go beyond the text of the challenged law to other matters, which usually requires reference to factual findings.[15] Because I am not authorized or equipped to make those factual determinations, my analysis is limited to subsection 5-73-306(a)(16)'s text. Accordingly, my responses cannot be conclusive or definitive.
As noted above, the first step in assessing subsection 5-73-306(a)(16) is determining whether the law is neutral and generally applicable. As the Eighth Circuit Court of Appeals has interpreted Supreme Court jurisprudence, laws enacted with an intent to regulate religious worship are not neutral and generally applicable.
In my opinion, a court would likely hold that the statute's text does not indicate an intent to regulate religious worship. The ban on concealed firearms in houses of worship does not favor one religion over another religion because the ban applies toall houses of worship. Further, when reading the ban in the context of the entire statute, as we are required to do, the ban also applies to many secular places.[16] Thus, the law does not favor religion over non-religion. Because the statute does not favor one version of religion over another, or religion over non-religion, the statute, as a textual matter, does not appear to show any intent to regulate religious worship. Therefore, as a textual matter, I believe a court would probably hold that the above arguments indicate that the presumption of constitutionality is not overcome. Accordingly, the text of subsection 5-73-306(a)(16) likely does not *Page 9 
offend the Free Exercise Clause of the First Amendment to the United States Constitution.
Question 2: Does A.C.A. [§ ] 5-73-306[a](16), which prohibitsconcealed carry licensees from carrying a concealed handgun into achurch, violate the Establishment of Religion Clause of theFirst Amendment to the United States Constitution?
As with your first question, this precise question has never been addressed by any state appellate court, any level of the federal courts, or Attorney General opinion in any state. Accordingly, your question is very much an issue of first impression and my opinion is based on analogous case law and scholarly commentary.
The threshold question in an establishment clause challenge is whether the challenged statute favors one religion over another religion on the face of the statute. Hernandez v.Commissioner, 490 U.S. 680, 695 (1989). If the law discriminates among religious denominations on its face, then the law is subject to strict scrutiny. Id. If not, then the court will apply the test elucidated in Lemon v. Kurtzman, 403 U.S. at 602 (1971). In my opinion, a court would likely find that A.C.A. § 5-73-306(a)(16) does not favor one religion over another religion because the ban on concealed carrying applies to "[a] church or other place of worship. . . ."
Given that the statute does not favor one religion over another on its face, a court would then evaluate the statute under theLemon test. In Lemon, the Court developed a three-pronged test to evaluate whether a statute violates the establishment clause: "First the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." Lemon,403 U.S. at 612. A law is unconstitutional if it fails any of the three prongs.[17] *Page 10 Lemon's first prong requires the law to have a secular purpose. According to Professor Greenawalt, a prominent scholar of the religion clauses, the secular-purpose requirement simply requiresa secular purpose: "Under the Lemon test, a law must have a secular purpose. According to the Supreme Court, this does not mean that its exclusive or main purpose must be secular. It is enough that it have a substantial secular purpose, even if it also has a religious purpose."[18] Very few laws have ever been invalidated for lacking a secular purpose.[19]
To discern a law's purpose, courts will look to the law's language, what the new law adds to preexisting laws, and any available legislative history.[20] The latter two methods are not much help in assessing section 5-73-306(a)(16). Legislative history is little help because, unlike Congress, Arkansas's legislature does not publish records of its legislative proceedings, debates, or committee reports.[21] The only "legislative history" to speak of is the earlier version of a statute, if one exists. But an assessment of the earlier version will not aid us for the same reason that an assessment of preexisting laws will not aid us. This is because the ban on carrying concealed firearms in places of worship — along with most of the other banned areas — was enacted alongside the general rules permitting concealed carrying in the first place. Thus, the ban on concealed carrying in places of worship did not affect much preexisting law. The ban came into existence at the same time as the general rule permitting concealed carrying.[22] *Page 11 
Thus, we must evaluate whether subsection 5-73-306(a)(16) has a secular purpose by reference to the text of the statute itself. Two rules will aid us in this analysis. First, as noted above in the free-exercise analysis, statutory construction rules require us to construe a statute as a whole. Consequently, when evaluating the specific ban on concealed carrying in places of worship, we must construe the ban in light of the entire statute, which applies the ban to many other places. Second, the Supreme Court has made clear that a legitimate secular purpose can be to "even the playing field," so to speak. Corporation of the Presiding Bishop v.Amos, 483 U.S. 327, 335 (1987). In Amos, the Court upheld an exemption in Title VII, which exemption allowed religious organizations to discriminate in their hiring. The Court reasoned that such an exemption satisfied Lemon's secular purpose requirement because the law's permissible purpose was to "alleviate significant government inference with the ability of religious organizations to define and carry out their religious missions."[23]
In my opinion, a court would likely find that subsection 5-73-306(a)(16) has a secular purpose and, thus, satisfies Lemon's first prong. As a textual matter, the statute does not discriminate among religions because, as noted above, it applies to all religions. Further, when subsection 5-73-306(a)(16) is construed within the wider context of the section 5-73-306 as a whole, we see that the bans on places of concealed carries also extend to several secular places. A common theme of each banned area is that the areas tend to be crowded. It appears, then, from a purely textual reading, that subsection 5-73-306(a)(16) has a legitimate secular purpose of banning concealed carrying in areas that tend to be highly populated, which includes places of worship. Therefore, section 5-73-306(a)(16) probably passesLemon's first prong.
Since Lemon was decided, the Court has largely combined the second and third prongs. See Agostini v. Felton,521 U.S. 203, 232-33 (1997). Today, the third prong (i.e., excessive entanglement) is generally viewed as a factor in determining *Page 12 
whether the second prong (i.e., secular effect) is met.[24] Acomplete "effects" inquiry requires that certain factual determinations be made. These factual determinations are outside the scope of my authority and ability. Therefore, in evaluating the "effects" prong, I am limited to the legal and textual aspects, and I must leave the factual aspects unanswered. That is, I must limit my analysis to an evaluation of the statute's text to determine its constitutionality. Because facial neutrality will not salvage a program under the "effects" test, my responses cannot be definitive.Bowen v. Kendrick, 487 U.S. 589 (1988).
As a facial matter, and as indicated above, the effect of a ban on concealed weapons in all "house[s] of worship" appears to further the quite secular purpose of not allowing secreted weapons in highly populated areas. Accordingly, the ban on concealed firearms in houses of worship appears to have a secular effect.[25] Therefore, in my opinion, a court would likely hold that subsection 5-73-306(a)(16) does withstand Lemon's test and, consequently, does not violate the Establishment Clause.
Question 3: Does A.C.A. [§ ] 5-73-306(a)(16), which prohibitsconcealed carry licensees from carrying a concealed handgun into achurch, violate the Religious Land Use and Institutionalized PersonsAct ("RLUIPA") (42 U.S.C. 2000cc et seq.)?
In my opinion, a court would probably hold that A.C.A. § 5-73-306(a)(16) does not violate RLUIPA because Arkansas's statute does not fall within RULIPA's scope. Under RLUIPA, if a law that falls within its scope substantially burdens a sincerely held religious belief, then the government must show that it has a compelling interest in the goal the law is intended to favor and the law must be narrowly tailored to achieve that goal. 42 U.S.C. § 2000cc et seq.
The threshold issue is determining what laws fall within RLUIPA's scope. The Eighth Circuit Court of Appeals has described RLUIPA's scope as limited to *Page 13 
prisoners and zoning laws: "RLUIPA applies only to land use regulations and persons in an institution. 42 U.S.C. § 2000cc etseq. A `[l]and use regulation' is a `zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land. . . .' 42 U.S.C. § 2000cc-5." Olsen v. Mukasey,541 F.3d 827, 831 (8th Cir. 2008) (internal quotations omitted);see also Edna Community Lutheran Church v. State,745 N.W.2d 194 (Minn. App. 2008) (holding that a state statute, which required that people be allowed to carry firearms on church parking lots, did not fall within RLUIPA's scope because the statute was not a land-use regulation).
In my opinion, a court would probably hold that subsection 5-73-306(a)(16) does not fall within RLUIPA's scope. Subsection 5-73-306(a)(16) is not a "zoning or landmarking law[] . . . that limits or restricts a claimant's use ordevelopment of land." (Emphasis added.) Nothing about the ban on carrying concealed firearms in places of worship pertains to the use or development of the land on which the house of worship sits. Therefore, underOlsen, subsection 5-73-306(a)(16) is not a land-use law. Given that RLUIPA only governs land-use laws, subsection 5-73-306(a)(16) cannot violate RLUIPA because the statute does not even fall within RLUIPA's scope.
Question 4: If your answer is yes to any of the abovequestions, what effect does that have on the enforcement of A.C.A.[§ ] 5-73-306(a)(16)?
Given my conclusions in the above analysis, this question is moot.
Question 5: Does enforcement of A.C.A. [§ ]5-73-306(a)(16) create a cause of action and potential civilliability for a civil rights violation by the government entitythat attempts to enforce the statute?
This question appears to assume that the statute is unconstitutional, and that the "government entity that attempts to enforce the statute" would thereby be violating citizens' civil rights. Given my conclusions in response to your first four questions, however, this presumption appears unwarranted. The enforcement of a valid law, taken in the abstract, cannot be a civil-rights violation.
Question 6: Suppose a landowner or possessor of a land permitshis or her guests or licensees to carry handguns on the landowner orpossessor's land. Does A.C.A. § 5-73-120(c)(1) provide a defense toprosecution of such a guest or licensee? *Page 14 
No. Arkansas Code Annotated § 5-73-120(c)(1) (Repl. 2005) is not relevant to whether a "landowner or possessor" may permit another person (whether classified as a guest or licensee) to carry a handgun on the landowner or possessor's premises. This statute is only relevant to whether possessors themselves may be exempt from prosecution for carrying weapons on their property:
 (a) A person commits the offense of carrying a weapon if he or she possesses a handgun . . . on . . . his or her person . . . with a purpose to employ the handgun . . . as a weapon against a person.
 * * * (c) It is a defense to a prosecution under this section that at the time of the act of carrying the weapon:
 (1) The person is in his or her own
dwelling, place or business, or on property in which he or she has a possessory or proprietary interest[.]
(Emphasis added.)
Assistant Attorney General Ryan Owsley prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General DM/RO:cyh
[1] At least eight other states have similar provisions that prohibit people from carrying concealed handguns into churches or other places of worship. Georgia: Ga. Code Ann. § 16-11-127(a)-(b); Louisiana: La.Rev.Stat. Ann. § 40:1379.3(N)(8); Michigan: Mich. Comp. Laws Ann. § 28.425o(e); Missouri: Mo. Rev. Stat. § 571.107(1)(14); Mississippi: Miss. Code Ann. § 45-9-101(13); North Dakota: N.D. Cent. Code § 62.1-02-05(1); South Carolina: S.C. Code Ann. § 23-31-215(M)(9); Virginia: Va. Code Ann. § 18.2-283.
[2] E.g. Wisconsin v. Yoder, 406 U.S. 205 (1971).
[3] E.g. United States v. Lee, 455 U.S. 252 (1982).
[4] If a law is subject to strict scrutiny, the government must show that it has a compelling interest in the goal it intends to further by the legislation and the legislation is narrowly tailored to achieve that goal. Church of the Lukumi Babalu Aye v.Hialeah, 508 U.S. 520, 546 (1993).
[5] See generally Kent Greenawalt, Religion and theConstitution: Free Exercise and Fairness, vol. 1, 32-34 (Princeton Univ. Press 2006); Erwin Chemerinsky,Constitutional Law: Principles and Policies, 1202, 1217 (2d ed., Aspen 2002).
[6] Church of the Lukumi Babalu Aye v. Hialeah,508 U.S. 520, 531 (1993) (separately analyzing whether the challenged law was neutral and whether it was generally applicable and stating: "Neutrality and general applicability are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied.").
[7] Richard F. Duncan, Free Exercise is Dead, Long Live FreeExercise: Smith, Lukumi, and the General ApplicabilityRequirement, 3 U. Pa. J. Const. L. 850, 857-59 (2001). One scholar strongly disagrees with the Eighth Circuit's interpretation. Douglas Laycock, The Supreme Court and Religious Liberty, 40 Cath. Law. 25, 27-28 (2000).
[8] Lukumi, 508 U.S. at 533-35.
[9] Id. at 535-42.
[10] Id. at 540.
[11] Many scholars are skeptical about the scope of these exceptions. E.g. Michael W. McConnell, Accommodation ofReligion: An Update and a Response to the Critics, 60 Geo. Wash. L.Rev. 685, 696 (1992) ("[T]he [Smith] opinion suggests certain exceptions to the rule, which on their face appear to be potentially expansive, but it seems probable that these exceptions were mentioned for the purpose of distinguishing disfavored precedents and will not survive to do serious work.").
[12] For more analysis of the hybrid-rights theory and the difficulty lower courts have with applying the test, seegenerally Duncan, supra note 7, at 857-59; Jonathan B. Hensley, Comment, Approaches to the Hybrid-Rights Doctrine in FreeExercise Cases, 68 Tenn. L.Rev. 119, 138 (2000).
[13] See generally, supra note 12.
[14] As noted above, the Lukumi Court spent a great deal of time evaluating the challenged law's "object" by reference to numerous factual matters that had been developed and preserved in the record before the Court.
[15] Lukumi, 508 U.S. at 534 ("We reject the contention advanced by the city . . . that our inquiry must end with the text of the laws at issue. Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination.").
[16] Some of these places include: "any courtroom" (5-73-306(a)(6)(A)); "any polling place" (5-73-306(a)(7)); "any meeting of the governing body of any governmental entity" (5-73-306(a)(8)); "any athletic event not related to firearms" (5-73-306(a)(11)); "any building where a state office is located" (5-73-306(a)(10)); "any school, college, community college, or university campus, building or event. . . ." (5-73-306(a)(14)).
[17] Numerous scholars and several Supreme Court Justices have noted that the Lemon test is largely defunct as a comprehensive test for establishment-clause challenges. Nevertheless, because the Court has not explicitly overruled it, lower courts must apply theLemon test, though it is regarded by many as inadequate. McConnell, supra note 11, at 685-86 ("[I]t is increasingly evident that the Lemon test is largely irrelevant or indeterminate when applied to most serious establishment issues."); Erwin Chemerinsky, Constitutional Law: Principles andPolicies 1159 (2002) ("The current and further role of theLemon test is uncertain. The test has not been expressly overruled or discarded. . . . Yet, a majority of the Justices on the current Court have expressed dissatisfaction with the test and have advocated alternatives. . . . The Court's three most recent establishment clause cases . . . all were decided without reference to the Lemon test."); Kent Greenawalt, Religion and theConstitution: Establishment and Fairness, vol. 2, 26 (Princeton Univ. Press 2006) ("By the mid-1990s, a total of seven justices . . . said they did not think the Lemon test should be used as a comprehensive approach to establishment cases. However, the Court has yet to explicitly disavow the test in a majority opinion. The consequence is that lower courts must continue to apply the test. . . .").
[18] Greenawalt, supra note 17, at 161.
[19] See Andrew Koppelman, Secular Purpose, 88 Va. L.Rev. 87, 93, 95-98 (2002).
[20] Greenawalt, supra note 17, at 161.
[21] See generally Coleen M. Barger, Arkansas LegalResearch 125 (Carolina Academic Press 2007).
[22] Acts 1995, No. 411, § 2.
[23] The Eighth Circuit Court of Appeals explains this point as follows: "The requirement the law serve a `secular legislative purpose' does not mean the law's purpose must be unrelated to religion. [T]hat would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted. Rather, the objective of the `secular legislative purpose' requirement is to `prevent the relevant governmental decision maker-in this case Congress-from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'U.S. v. Corum,362 F.3d 489, 495-96 (internal quotations omitted).
[24] See Greenawalt, supra note 17, 158; Op. Att'y Gen. Nos. 2002-137, 1999-444.
[25] The mere fact that religion is used as a classification in subsection 5-73-306(a)(16) does not, by itself, indicate that the statute violates either religion clause. Indeed, such classifications are quite common. See generally Michael M. McConnell, The Problem of Singling Out Religion, 50 DePaul L.Rev. 1 (2000) ("A recent survey of federal and state law revealed that the terms `religion' or `religious' appear over 14,000 times, and religious exemptions appear in over 2,000 statutes."); see also Professor Laycock's distinction between "formal neutrality" and "substantive neutrality" in Douglas Laycock, Substantive Neutrality Revisited, 110 W. Va. L.Rev. 51 (2007).